(No. 30082.—

LUTHER ANSON, Appellee, *vs.* WILL S. HAYWOOD *et al.,* Appellants.

*Opinion filed May 22, 1947—Rehearing denied September 16, 1947.*

STONE & STONE, and PRATT, HEFFERNAN & RAMSEYER, both of Bloomington, for appellants.

JOSEPH W. DEPEW, and COSTIGAN, WOLLRAB & YODER, both of Bloomington, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

This is an appeal from a decree of the circuit court of McLean county, awarding specific performance to the plaintiff, Luther Anson, of a part of an alleged contract to leave property by will. The complaint alleged that Carter Harris, a resident of Normal, shortly after his wife's death in 1916, promised plaintiff and his wife, Lutie Anson, if they would move into his home and keep house for him, provide his food and perform such services as he might require in and about the house and in caring for him the remainder of his life, he would, by his last will and testament, devise and bequeath to them, plaintiff and his wife, all of his property, both real and personal. Plaintiff alleged acceptance of this offer and that thereafter he and his wife gave up their own home which, was more convenient to his place of employment and moved into the home of Carter Harris. The complaint also alleged that

plaintiff and his wife provided the food, assumed and performed all of the manual work connected with the home and rendered and gave to Carter Harris such personal attention as was required and that, after the death of plaintiff's wife on October 22, 1940, plaintiff continued to furnish all the food and himself performed or caused his sister-in-law to perform the household duties and rendered and gave to Carter Harris such personal attention as was required until the latter's death. It was also alleged that plaintiff had in all respects carried out his agreements and that. Carter Harris had often stated he had made provisions to leave plaintiff and his wife all of his property because of the agreement but that, upon the death of Carter Harris in 1944, plaintiff learned that Harris had, on May 7, 1942, executed a will leaving plaintiff no portion of his estate, real or personal. The relief sought was that the defendants, the beneficiaries named in Harris's will and the executor, be compelled to specifically perform the agreement of Harris with plaintiff so far as the interest of the defendants in the real estate and personal property was concerned and, upon their failure so to do, the master in chancery be directed to execute a deed of conveyance to the real estate and that the executor be ordered to distribute to plaintiff the personal property after payment of the claims, court costs and expenses of administration. No question was raised by any of the defendants as to the sufficiency of the complaint and, upon issue being joined, the cause was referred to a special master in chancery.

By stipulation, the approximate value of decedent's real property, consisting of a house in Normal in which Harris and plaintiff resided, was fixed at $4000. The agreed value of the personal estate, exclusive of a diamond ring and household furnishings, was $12,800.06. The parties also stipulated that Harris left no child or children and no descendant of a child or children, his next of kin being only two persons who, upon diligent search, could not be

located. The exact age of the decedent could not be determined, and it was stipulated that he was an elderly gentleman. Certain testimony indicates that he was approximately eighty-four years of age at the time of his death.

On the hearing before the master, plaintiff called eleven witnesses, persons who had been neighbors, friends and associates of Harris and plaintiff. Defendants called ten witnesses, business associates, one fellow employee, and several members of the faculty and staff of the Illinois State Normal University where Harris had been employed as a janitor for many years. The master made his report, reviewing the testimony of the various witnesses and finding that "a reasonable doubt is cast upon the credibility of the witnesses on behalf of the plaintiff," for the reasons that Harris was dead; the testimony of plaintiff's witnesses was not undisputed; Harris was a man of honesty and integrity, and that, within approximately two years prior to his death, he executed a will in which he did not give, devise or bequeath any property to plaintiff. Accordingly, the master recommended that plaintiff's complaint be dismissed. Objections to the report were overruled and permitted to stand as exceptions. The chancellor entered a decree sustaining the exceptions in part and overruling them in part. The decree adjudged that plaintiff had proved the allegations of his complaint with respect to the real estate involved but not with respect to the personal property which should be distributed, pursuant to the provisions of the decedent's last will and testament, in due course of administration of his estate. The decree ordered the defendant, Will S. Haywood, to whom the real estate of Carter Harris was devised, to convey the property to plaintiff within twenty days from the date of the decree. The defendants, Will S. Haywood and W. H. Odell, executor of Harris's will, prosecute this appeal, a freehold being necessarily involved.

Haywood and the executor contend that the decree is not sustained by any allegations in the complaint; that the evidence fails to establish a contract; that the proof is not clear, certain and definite as to all of the terms of the alleged agreement; that, if the agreement sued upon did exist, it was terminated by the death of Luther Anson's wife prior to the death of Carter Harris; that if there had in fact been an enforceable contract then Luther Anson was not properly the sole plaintiff; that he had an adequate remedy at law, and that the alleged contract was within the Statute of Frauds and not removed therefrom by proof of part performance.

The evidence discloses that Carter Harris, a colored man, became employed at the Illinois State Normal University about the year 1908 as a janitor and continued in this employment until shortly before his death. His monthly salary ranged from $50 to $100. Harris was a member of the First Presbyterian Church of Normal and, for more than thirty years, a member of the board of directors of the Citizens' Savings Loan and Building Association of Normal, being the only colored man on the board. He was active in State Normal University athletic activities and gave a trophy known as the Carter Harris Trophy to the outstanding member of the football team of the school. The trophy has been awarded every year since Harris first presented it. He was a citizen highly respected by his business and university associates as well as his colored friends and neighbors.

From the evidence it appears that, at the time of his wife's death in 1916, Harris had a conversation with Mrs. Irene Thomas, a neighbor and friend, in which he asked her and her husband to come and live in his home, stating that he would give them the property "after he passed," but they did not accept this offer and that, on a later date, when Harris was visiting the Thomases he informed them,

"Luther and Lutie are going to take the proposition I offered you." Shortly after this conversation, plaintiff and his wife moved into Harris's house. Prior to this time, they had lived with Mrs. Anson's father, the latter's residence being much more convenient to plaintiff's work. Mrs. Thomas, who was not related to any of the parties, also testified that, during the time plaintiff and his wife lived at Harris's home, she knew, of her own knowledge, that they furnished Harris board, washing, and ironing, bought the groceries, and, in general, took care of the household expenses for a period of twenty-seven or twenty-eight years. B. V. Meaderds, a barber and tailor, who had known Harris for about thirty-five years, testified to a conversation with Harris in his barbershop about two years before Harris's death, and that, to an inquiry as to what disposition he had made of his property, Harris told him, "I have made provision for Luther to have everything that I have," and "Luther and his wife have taken good care of me and I am leaving everything to them. Luther has taken the place of my own son." Napoleon J. Calimese, superintendent of the Booker T. Washington Home, testified that he knew Harris for about thirty or thirty-five years, having frequently played checkers with him, and that, in the course of a conversation with Harris with reference to plaintiff and his wife moving in with him, Harris told him he had to have someone to look after him and that Luther and Lutie were going to have what little he owned when he died. Calimese stated that he had engaged in subsequent conversations with Harris, all being to the same effect. Other witnesses in behalf of plaintiff testified relative to similar conversations with Harris and submitted testimony to the effect that plaintiff paid various and sundry bills for the repair and maintenance of the property and for the food consumed in the household.

The evidence adduced by defendants consisted almost

entirely of testimony by Harris's acquaintances and associates at the State Normal University and the Loan Association. Their testimony was principally to the effect that, on the occasions they had seen Harris and in conversations with him, he never, at any time, referred to any arrangement with plaintiff by which he was to give the latter his property at the time of his death. Most of them testified that he never discussed this question in their presence, the gist of their testimony being that Harris was a man of high character and integrity, and respected by everyone. Only one witness, William A. Rice, was called by the defense in dispute of the agreement. He was also a janitor at the university, and Harris had worked under his direction. The substance of Rice's testimony was that Harris said to him that plaintiff was to take care of him for the use of the house, pay no rent and "let him have room and board." On cross-examination, this witness stated that Harris indicated the house would probably belong to Anson and his wife some day if they took care of him satisfactorily.

The will of Carter Harris, dated May 7, 1942, approximately two years before his death on April 21, 1944, after providing for the payment of funeral expenses, devised his residence in Normal, to the defendant, Will S. Haywood, together with his personal effects, jewelry and furniture. The will then gave legacies in the amount of $200 each to six individuals, including the defendant, Will S. Haywood; the same amount to the Ladies Aid Society of the First Presbyterian Church at Normal, the McLean County Home for Colored Children, Normal, Illinois, and the National Association for the Advancement of Colored People; $50 to the Presbyterian Brotherhood of Normal Presbyterian Church, and $500 to the Students' Loan Fund of Illinois State Normal University. The will further provided that if, after the payment of the legacies there remained a balance on hand, the executor should increase each of the legacies *pro rata* among the legatees.

Defendants contend that the contract between Carter Harris and plaintiff and his wife was not sufficiently proved. The testimony of Mrs. Irene Thomas, a friend and neighbor of Carter Harris, who is in no way related or connected with any of the parties to this action, is not contradicted or disputed. From her testimony it appears that Harris made Mrs. Thomas and her husband a proposition wherein if they came to his home and lived with him and provided him with care and maintenance for the rest of his life they were to receive the house upon his death. Her testimony further establishes the fact that Harris entered into a similar agreement with plaintiff and Lutie Anson. Complaint is made that the terms of the contract were not defined with sufficient certainty or clarity. The terms of an oral contract naturally are not subject to the same explicit proof as those of a written contract, and, particularly, is this so of a contract of the type involved in this litigation.

It is true, as defendants maintain, that evidence offered in support of a contract to make a disposition of property in a manner other than provided by law should be accepted with caution and examined with scrutiny. (*Chambers* v. *Appel*, 392 Ill. 294.) Again, where there is a material conflict in the evidence or where none of the immediate friends, relatives or acquaintances of the decedent testify as to the making, or the existence, of a contract, or where there is dispute as to the type of service performed by the proponent of the contract, the court will not grant specific performance. (*Rigolio* v. *Knopf*, 390 Ill. 258.) In the case at bar, there is no dispute as to the type of service performed by Luther Anson. The length of time over which he has performed the service,—more than twenty-five years,—is substantial, and there is no showing that plaintiff and his wife in any way took advantage of Harris, or any of his rightful heirs. The strongest evidence against the existence of a contract is the fact that approximately

two years before his death Harris made a will, excluding plaintiff as a beneficiary and expressly devising the house in which he lived to the defendant, Haywood, a resident of Chicago, who was not related to, and whose previous connection or association with, him is not shown by the record. The existence of this will is a fact to be considered in determining whether there was a contract between Harris and plaintiff and his wife, but we do not regard the existence of the will as being of sufficient weight to warrant a finding that there was no contract in view of the years of faithful service performed by plaintiff, particularly since there is testimony in the record indicating that, within two years of his death, Harris made statements to the effect he had provided for plaintiff to receive everything upon his death. The fact that a promisor executes a will disposing of property out of harmony and inconsistent with an oral contract is a circumstance to be considered as bearing upon the improbability that such a will would have been made while under the obligations of a contract, but such fact does not deprive plaintiff of his right to enforce the contract upon establishing its existence by clear and convincing proof and showing performance on his part. (*Chambers* v. *Appel*, 392 Ill. 294.) Although there is testimony in the record indicating that Harris was a highly respected citizen and a man of unquestioned integrity, the evidence was not of sufficient weight to preclude the chancellor from finding that Harris made his will in violation of the contract rights of plaintiff where it affirmatively appears that, at the time he made this will, he was a man past eighty years of age and in failing health. The fact Harris was able to accumulate a personal estate of approximately $13,000 upon the modest salary he had received during his working years, fortifies the conclusion that the contribution of plaintiff to the maintenance of the household was substantial. The chancellor scrutinized this

contract, and a careful review of the testimony of the witnesses confirms the finding that the contract was amply proved.

Defendants contend, further, that the contract between the plaintiff and his wife and Harris is within the Statute of Frauds and that, therefore, no action could be maintained thereon for specific performance. This defense is without merit since the evidence sufficiently establishes that there was an oral agreement between plaintiff and his wife and Harris and fully discloses that, pursuant to this agreement, the former performed services and conferred benefits upon Harris until his death. An oral contract, even for the future conveyance or devise of land, is not within the Statute of Frauds if it has been completely performed by one of the parties thereto. (*Fleming* v. *Dillon,* 370 Ill. 325.) Courts of equity grant relief in such cases on the theory that the parties cannot be placed *in statu quo* or damages awarded which would be full compensation. The Statute of Frauds, the only purpose of which is to prevent fraud, may not successfully be interposed as a defense in equity where the effect would be to perpetrate a fraud. (*Fleming* v. *Dillon,* 370 Ill. 325; *Mayo* v. *Mayo,* 302 Ill. 584.) The granting of equitable relief by specific performance is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of the particular case. (*Fierke* v. *Elgin City Banking Co.* 366 Ill. 66.) After a careful review of the testimony, we believe that the chancellor properly granted specific performance, since the contract had been completely performed by plaintiff and his wife and plaintiff did not have an adequate remedy at law.

Defendants also contend the decree is not sustained by the allegations in the complaint for the reason that plaintiff alleged he was entitled to all of the property of Harris, both real and personal, while the decree found that the

contract between plaintiff and his wife and Harris concerned only the residence in which Harris lived. The decree is immune from attack on this ground. In addition to asking for specific relief, plaintiff also prayed for general relief. A plaintiff may be denied the special relief sought in his complaint but, under the prayer for general relief, granted such relief as he may be found to be entitled to under the proof. *Updike* v. *Smith*, 378 Ill. 600; *Churchill* v. *Marr*, 300 Ill. 302.

A further contention made by defendants is that if there was an enforceable agreement between plaintiff and his wife and Harris, Luther Anson, the surviving husband, is not properly the sole plaintiff. This defense was not raised or urged until defendants filed their briefs in this court. The Civil Practice Act (Ill. Rev. Stat. 1945, chap. 110, par. 172,) prescribes the manner of raising the defense that a plaintiff does not have capacity to sue by motion to dismiss. The act further provides that failure to raise the defense by motion shall not prejudice raising it by answer. Defendants were under a duty to raise this defense in the trial court and, not having done so either by motion or by answer, the issue is not open to consideration upon review. Under the Practice Act of 1907, this court held that an objection to misjoinder of parties plaintiff should be raised by demurrer or answer and, not having been so raised in the trial court, such a defense would not be considered by this court when made for the first time upon appeal. (*Curry* v. *Cotton*, 356 Ill. 538; *Bittner* v. *Field*, 354 Ill. 215; *Hill* v. *Siffermann*, 230 Ill. 19.) The same rule applies under the present Civil Practice Act.

The decree of the circuit court of McLean county is right, and it is affirmed.

*Decree affirmed.*