In the Matter of the Estate of Mabel C. Shed, Deceased.
(Maude Short and Mildred Short, as Co-Executors of the Estate of Mabel C. Shed, Deceased, Defendants-Appellants,) v. Harriet Winters, Plaintiff-Appellee.

**Gen. No. 64–45.**

Second District.

April 13, 1965.

Spray, Price, Townsend & Cushman, of Chicago (James H. Dubbs, of Mendota, and James T. Otis and Minard E. Hulse, Jr., of Chicago, of counsel), for appellants.

Robert H. Reck and Fred P. Wagner, of Mendota, for appellee.

ABRAHAMSON, P. J.

This is an appeal by the executors of the Estate of Mabel C. Shed, deceased, from an order entered in the Circuit Court of Kane County allowing the claim of Harriet Winters, plaintiff, for one-half of the net distributable estate of Mabel C. Shed, deceased, based upon an alleged oral agreement to make a will. The uncontroverted facts appear as follows:

The decedent was the second and childless wife of Charles E. Shed who died intestate June 21, 1938, leaving as his only heirs his widow, the decedent herein, and DeWitt Shed, a son, issue of his first marriage. DeWitt Shed died testate in 1951 leaving him surviving his widow, Viola, and a daughter, Harriet Shed, now known as Harriet Winters, the plaintiff in this action. Maude Short and Mildred Short were appointed executors under the Will of Mabel C. Shed, deceased. They are the sisters of Mabel C. Shed who had moved into the marital home of the senior Sheds shortly after the death of Charles E. Shed.

In August of 1935, Charles E. Shed, together with his wife, Mabel C. Shed, executed deeds to real estate dividing the same between Mabel C. Shed, the decedent herein, and his son, DeWitt Shed. These deeds were not recorded until July 11, 1938, after the death of Charles. On or before July 8, 1938, Mabel C. Shed gave the sum of $4050.95 to DeWitt Shed representing one-half of a joint tenancy account which stood in the names of herself and Charles E. Shed. On July 15, 1938, DeWitt Shed executed an assignment of one-sixth of the estate of his father to Mabel C. Shed reciting: "For value received" and she having, heretofore, in writing, waived a widow's award in said estate. Thereafter, DeWitt Shed and his family moved out of the area and he and Mabel C. Shed did not see each other again, nor did they communicate before his death in 1951. DeWitt Shed's will made no reference to any agreement with Mabel C. Shed to make a will. On or about April 1, 1940, DeWitt executed a receipt to his father's administrator, reading in part as follows:

"... all in full of amount due me as only heir at law of said decedent, and also under the terms of my certain assignment, duly recorded in the Probate Court of LaSalle County, Illinois."

The controverted facts are these: Viola Shed, the widow of DeWitt, testified that within three or four days after the death of Charles E. Shed, she and her husband visited his stepmother, at which time the following conversation allegedly took place between DeWitt and his stepmother:

"A. DeWitt said: 'I am going to give you half (½) of the estate, with provision that at the time of her death, that it comes back to me, or my daughter.' And if it happened his death or

hers was first, it would come back to the Charles Shed estate, and if not, if Harriet were living, it would come back to both of them.

"Q. What did Mrs. Shed say at that time?

"A. She was agreeable, but that was a fair deal. (Objection by Mr. Otis.)

"Q. As near as you remember, Mrs. Shed, DeWitt Shed said he would give her half of his estate. What did she say, if you remember? What words did she use?

"A. She said that was a very fair arrangement."

Within the next week DeWitt reportedly said to Mabel, I am going to give you half of the estate, and she was to have replied, That is a fair and square arrangement.

Viola Shed admitted during cross-examination that when her deposition was being taken she responded in reply to a question regarding Mabel's alleged oral contract to make a will, as follows:

"That was understood why he left the amount that he did to her, because it was his father's wish it was to be divided that way. They were trying to do what his father had suggested or asked him to do."

Her testimony, of course, is open to the objection that it is self-serving, in view of the fact that she is the mother of the plaintiff.

The plaintiff called Mabel Tower, then 68, who testified that she was present during a conversation which took place between DeWitt and his stepmother within a week after the death of Charles, which would have fixed the conversation no later than June of 1938. DeWitt is reported to have said that he would give

Mabel one-half of the estate, with the understanding that when she passed away the one-half would return to him, or, in the event of his death, to his daughter, Harriet. Mabel Shed is reported to have agreed.

■ Factors militate strongly that either no such agreement was made, or, if made, was cancelled. These factors are as follows:

1. On July 8, 1938, Mabel Shed gave DeWitt $4,050.95 from her joint tenancy account with her deceased husband;

2. On July 11, 1938, the deeds were recorded and presumptively accepted by the grantees;

3. On July 15, 1938, DeWitt executed the assignment, using the quoted language;

4. On or about April 1, 1940, DeWitt executed a receipt for his distributive share, containing the quoted language;

5. No further communication was had between the parties regarding the alleged contract, and

6. DeWitt's widow testified that the disposition of Charles Shed's estate was made in keeping with that decedent's wishes.

The law applicable to a controversy such as this is well defined and includes the rule that the fact that a promisor executes a will disposing of property out of harmony and inconsistent with an oral contract is a circumstance to be considered as bearing upon the improbability that such a will would have been made while under the obligations of a contract. Anson v. Haywood (1947) 397 Ill 370, 74 NE2d 489.

In Greenwood v. Commercial Nat. Bank of Peoria (1955) 7 Ill2d 436, 130 NE2d 753, our Supreme Court had occasion to pass upon another controversy in-

volving an alleged oral contract to make a will, and in this connection it observed on pages 440 and 441 that:

> "Our attention in this cause shall be first directed to the principle that the evidence necessary to support a decree of specific performance must be clear, explicit and convincing. In this regard we have held that the proof must establish the parol contract in certain, definite and unequivocal terms and be so convincing that it will leave no doubt in the mind of the court. Williams v. Corcoran, 346 Ill 105; Galapeaux v. Orviller, 4 Ill2d 442. Or, as the rule has sometimes been stated, where one of the parties is dead and unable to give his version of the matter, the heirs being necessarily limited to collateral facts, circumstances and matters, the court is not compelled to believe a witness simply because he testifies to the contract, but such testimony, often given by interested witnesses, will be closely scanned and tested by its own inherent probability or improbability and by ordinary rules of human conduct under similar circumstances."

This case is cited approvingly in Harper v. Kennedy, (1958) 15 Ill2d 46, 153 NE2d 801, and in 36 ILP Wills, Section 6, page 127.

██ Not only did the plaintiff in the case at bar have to prove what she alleged, but she had to prove it by evidence that had to be clear, explicit and convincing, and in the view which we take of the evidence the plaintiff has failed to discharge that burden. Not only was the testimony of DeWitt's widow open to the charge of coming from an interested source, she admitted having said during her deposition that the disposition made of Charles E. Shed's estate was in accordance with that decedent's wishes, and appar-

201

ently, did not arise out of a contract between Mabel Shed and her stepson, DeWitt.

Assuming that Mabel Tower accurately recollected the conversation which took place some twenty-five years ago, it was contradicted by unequivocal documentary evidence supplied by DeWitt manifesting a clearly contrary intention.

Upon the circumstances of this case we are impelled to the conclusion that the plaintiff failed to sustain the burden of proof imposed upon her, and that the order granting her one-half of the net distributable estate of Mabel C. Shed was erroneous.

The judgment of the trial court is accordingly reversed.

Judgment reversed.

CARROLL and MORAN, JJ., concur.