(No. 20595.—

NELLIE CORCORAN WILLIAMS *et al.* Appellees, *vs.* ANNA CORCORAN, Appellant.

*Opinion filed October 23, 1931—Rehearing denied Dec. 2, 1931.*

THOMAS J. YOUNG, for appellant.

ANDERSON & CLARKE, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Nellie Corcoran Williams and Margaret S. Demling, sister and niece, respectively, of John Corcoran, who had died intestate, filed a bill in the circuit court of Cook county praying partition of certain Oak Park residence property owned by John. Anna Corcoran, another sister of John, was named defendant. Anna filed an amended answer and

a cross-bill, in both of which she claimed ownership of the property by virtue of an alleged agreement between herself and John whereby she was to receive it in return for keeping house for him and taking care of him until his death. The prayer of the cross-bill was for specific enforcement of the agreement. The cause was referred to a master, who heard the evidence and filed a report recommending that a decree in partition be entered and that the cross-bill be dismissed for want of equity. From a decree entered in accordance with this recommendation Anna Corcoran has appealed.

In the absence of a valid and enforceable contract there can be no basis for a decree of specific performance. Was there such a contract here? It is admitted that there was no written agreement, but appellant relies upon the rule that the chancellor may enforce an oral contract where there has been full performance by the party seeking equitable relief. We must determine, therefore, whether there is here disclosed of record an oral contract, which, coupled with performance thereof on appellant's part, would afford a proper basis for a decree in her favor.

Before a parol contract for the conveyance of real estate will be specifically enforced in a court of equity it must appear to be certain, definite and unequivocal in its terms. The proof upon which the conveyance is asked must be established so convincingly that it will leave no reasonable doubt in the mind of the court. (*Adkins* v. *Adkins,* 332 Ill. 422; *Joseph* v. *Evans,* 338 id. 11; *Stephens* v. *Collison,* 313 id. 365; *Anderson* v. *Augustana College,* 300 id. 72; *Crawley* v. *Howe,* 291 id. 107; *Weir* v. *Weir,* 287 id. 495; *Davier* v. *Kaiser,* 280 id. 334; *Mould* v. *Rohm,* 274 id. 547; *Reynolds* v. *Wetzler,* 254 id. 607; *Wallace* v. *Rappleye,* 103 id. 229.) Courts of equity scrutinize with the most scrupulous care the evidence offered in support of a contract to make a disposition of the property of a deceased person different from that which the law pre-

scribes. (*Yager* v. *Lyon,* 337 Ill. 271; *Anderson* v. *Augustana College, supra; Davier* v. *Kaiser, supra; Shaw* v. *Schoonover,* 130 Ill. 448.) In order to entitle a person to specific performance of an alleged contract to convey land the contract itself must be proven. The mere expression of an intention to make a gift of the land will not suffice. *Crawley* v. *Howe, supra; Davier* v. *Kaiser, supra; Galloway* v. *Garland,* 104 Ill. 275.

To establish the alleged contract appellant placed upon the stand several witnesses who had talked with John Corcoran before his death. Paul Henneberry, who worked with him on the same job every day for seven or eight years and talked with him every day, testified that before John bought the property here involved he said he wanted, and intended, to buy the home if he could get his sister to go with him, but he was afraid she was going to get married and he was afraid to live in it alone, and that later he said his sister was going to keep house for him and he was going to purchase a home. C. E. Smith, the real estate broker who negotiated the deal by which the property was sold to John, testified that a month or two after the deal was closed John came to see witness; that witness quizzed John about being a bachelor and buying a home and asked if he were going to get married, whereupon John replied that it was probable he would never marry, and that even so he had a roof over his head and someone to take care of him, and that about a month or so later John said he thought perhaps appellant would never marry as long as he was alive and would live there and take care of him. In answer to a question as to just what John said, witness replied: "He said Anna was his sister, who would have everything when he died; that is, he didn't say this but I inferred it." Smith also testified that John said he did not have any use for the rest of the bunch and did not want them to have a dollar of his money when he died. Horace Doyle, who had known John since 1907 and had worked with him for five

years or so and ate lunch with him every day, testified that John said that his only aim was to save up enough money to buy a home and get away from his family; that at John's home one night he told witness that he had gotten his sister to come and live with him and was saving considerable money and was pretty happy; that at other times he told witness that he was glad to have appellant come to live with him as she was the only sister that ever had any use for him, and his family had no use for him outside of this one sister; that he intended to live there until he died and would never sell the home or convert it into business property; that he further told witness that it was his home and he would keep it and when he died everything would go to appellant; that shortly before he died witness asked him why he did not make a will like witness had done, and he replied that if he did he would not live very long, adding: "Well, it won't make any difference; my sister will get it all when I die, anyway."

On rebuttal, and over objection, appellant was allowed to testify to what she told Fred J. Kuhn in a conversation had after John's death. She testified that she said to Kuhn: "You know when my mother died she left us all a little bit in the estate, and she left me $5000, and I said to John I wanted to buy a little home while I have the money, whereupon John said, 'No, I am going to buy a home; you put your money out at interest and I will buy the home and that will always be yours;'" and that she further said to Kuhn: "You know, I went with John then, and I kept house for him and I cooked for him."

About three weeks after John's death appellant filed in the probate court of Cook county a claim against the estate of John, claiming for services as "housekeeper, dietician, cook, laundress and janitress," from August 1, 1917, to May 30, 1928, at $100 per month, $13,000, and for damage to health on account of lack of heat $10,000, total $23,000. This claim was dismissed after hearing.

After John's death a special assessment against the property and a plumber's bill were paid by contribution of one-third from each of the parties to this cause, appellees testifying that appellant requested them to pay a third each. Appellant denied that she had requested such contribution, and stated that she received the two-thirds contribution from the attorneys for appellees before she was advised as to her rights.

Considered in the light of the principles announced by the authorities above cited, the evidence adduced by appellant, assuming it all to be properly admissible, falls short of establishing a contract which a court of chancery can undertake to enforce. The situation disclosed is quite similar to that which was under consideration in *Wrestler* v. *Tippy*, 280 Ill. 124, where a sister and her husband moved to the home of the brother, Abram Leonard, under an alleged agreement by which they were to care for Leonard during the remainder of his life and as compensation were to receive certain land. We there said: "There is no direct evidence as to the alleged contract or its terms and conditions. The only proof on this question is casual statements made by the deceased to his neighbors at different times to the effect that he wanted the Wrestlers to come and take care of him and to have his property at his death. None of these statements appear to have been made by him in the presence of either of the Wrestlers." After detailing the testimony of a number of witnesses who stated that Leonard said that the Wrestlers were going to take care of him, or actually were doing so, and would stay with him as long as he lived, and that he was going to give them what he had when he died, we concluded: "In the instant case the declarations proven wholly fail to establish any contract binding upon any of the parties and amount to no more than the mere expression of a present intention and desire that Wrestler and wife should have the property at Leonard's death. They were of a character from which

the Wrestlers might well expect to be made favored beneficiaries under his will but are lacking in all of the essential requirements of a definite present contract to give or convey his property to them in the future in consideration of their caring for him until his death. The act of Wrestler and his wife, also, in filing claims against his estate for labor and services of a character which would have been included in the alleged contract of the deceased is so inconsistent with the making of any definite and clear contract of the character sued on as to detract very materially from the weight to be given to the casual remarks made by the deceased to his neighbors and friends expressive of his intention to give his property to the Wrestlers."

Appellant rightly insists, on the authority of *Aldrich* v. *Aldrich,* 287 Ill. 213, and other cases cited, that the filing of the claim and acceptance of contribution for payment of the bills against the property are not conclusive that there was no contract, but we cannot accede to the contention that these actions must be left out of consideration entirely.

Appellant argues, upon the basis of certain language used in *Mundy* v. *Joliffe,* 5 Myl. & C. 167, *Brown* v. *Sutton,* 129 U. S. 238, *Whitney* v. *Hay,* 181 id. 77, and other authorities cited, that the evidence as to appellant's caring for John should be accepted as evidence of the existence of some agreement between herself and John, and that the present case is one in which the court should "struggle to prevent injustice from being effected" and should "strain its power" to find the terms of a contract. Taking this point of view, appellant insists, will lead to the conclusion that John's declarations, considered together with all the other facts and circumstances, call up a convincing implication that there was an agreement which chancery should enforce. A sufficient answer to the argument is, that the principles which necessarily govern the decision of the pres-

ent case have been clearly and decisively announced by this court in the authorities which have been cited in this opinion as well as in many others to which it is unnecessary to refer, and no latitude is afforded for action such as that for which appellant contends.

The decree of the circuit court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*