(No. 32208.—

KATHLEEN TESS, Appellee, *vs.* RICHARD H. RADLEY, Exr.,
*et al.*, Appellants.

*Opinion filed May 22, 1952—Rehearing denied September 15, 1952.*

GALBRAITH & BAYMILLER, of Peoria, for appellants.

BRIAN & WILSON, of Toulon, and HARRY C. HEYL, of Peoria, for appellee.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

This is a direct appeal by trustees of the Presbyterian Church of Princeville, Illinois, and Board of Foreign Missions of the Presbyterian Church of U.S.A., a religious corporation, hereafter referred to as appellants, from a decree of the circuit court of Peoria County granting specific performance of an oral contract between William Rude and his adopted daughter, Kathleen Tess, hereafter referred to as appellee. A freehold is involved.

The complaint was filed January 17, 1949, by Kathleen Tess. The executor and all legatees and devisees under the will of William Rude, deceased, were made defendants.

The original complaint alleged that on or about August 2, 1934, when appellee was eighteen years of age, her father made an oral agreement with her to the effect that if she did not marry until she was 25 years of age and if she would stay with her parents, continue to help with the farm work and take care of her mother until her death, he would will her all of his property when he died

and that he would furnish her with clothing and spending money in the sum of $2 per week. The complaint further alleged that appellee accepted the proposition and fulfilled her part of the contract and prayed specific performance of the contract, alleging that she had no adequate remedy at law.

Appellants' answer denied the making of the contract and alleged that if such an agreement had ever been made, it had been breached and abandoned by appellee. Appellants also pleaded the Statute of Frauds and alleged that the services performed by appellee for her father were not solely referable to the contract and that she did not change her position for the worse in making the contract or performing the services.

The cause was referred to a master who heard the evidence. After all the testimony was taken, appellee was permitted to file an amendment to her complaint by which she alleged that the oral contract was made with her father in the summer of 1932 when she was sixteen years of age. The amendment further alleged that appellee received no compensation for her services from either her father or her mother. Appellants answered the amendment, denying the same and praying that the complaint be dismissed. All pleadings were under oath.

The master recommended a decree of specific performance. Exceptions to the master's report were overruled and the court found that sometime in the summer of 1932, and prior to the beginning of the 1932 fall term of the Wyoming Community High School, and in consideration of services rendered in the past, and to be rendered in the future, and in further consideration of her quitting school, William Rude entered into a contract with appellee to the effect that if appellee would not get married until she was 25 years of age, and during said time would stay with her parents and live with them and continue to help him in his farm work, and take care of her mother, and in

case she married before her mother's death, that she would continue to take care of her mother until her death, that he would will her all his property when he died. A decree was entered in accordance with the master's recommendations.

The evidence discloses that appellee was adopted by William Rude and Mary Rude, his wife, on August 21, 1916, when she was about three weeks old. At that time the Rude family consisted of William and Mary Rude and one son, John. William Rude was 39 years of age, Mary was 37 and John was seven. They resided on a part of the hundred-acre farm here in controversy, the balance of said farm being purchased by William Rude after the date of his alleged contract with his daughter. From the time she was old enough, appellee helped her mother in and around the Rude home, and as she grew older, helped her father around the farm. She attended the country school and went one year to the Wyoming Community High School, that year beginning in September, 1931. She was not permitted to continue her high school education because her father said he needed her at home and she was not learning anything. She passed all of her subjects. She performed considerable manual labor about the farm, doing chores, feeding hogs, milking cows night and morning, cleaning stables, picking and shoveling corn, running the tractor, shocking oats, and generally doing the work of a man. She was not permitted to have social contacts except to visit relatives and neighbors with her parents and to attend church. Mrs. Rude was frail and suffering from arthritis and as early as 1934 appellee was doing most of the housework. Later, Mrs. Rude contracted cancer from which she suffered for several years and died on January 4, 1944. Appellee nursed Mrs. Rude until the time of her death without assistance except for occasional help volunteered by the neighbors.

John Rude, the son, left the Rude household when he was fourteen years old because he could not get along with

his father. In 1935, Mrs. Rude purchased a farm for John to live on and he resided there until the year 1939, when he was killed by an unknown assailant. He was never married and left no children him surviving. Two youths were accused of his murder and Mr. and Mrs. Rude employed counsel to assist in prosecuting them, but they were acquitted. The evidence shows that after the acquittal Mr. and Mrs. Rude were fearful that something might happen to them and in particular to appellee. Appellee became nervous and lost weight and in the fall of 1940 she went to Clarks Grove, Minnesota, where she obtained employment as a domestic for several months. While she was in Clarks Grove she was operated upon for appendicitis and in May, 1941, after her operation, she returned to live with her parents. They continued to live on the Rude farm until after Mrs. Rude's death in 1944. After John's death Mrs. Rude sold the farm she had purchased for him to live on and made a will leaving all of her estate to her husband, but in the event that he should predecease her, then everything was to go to appellee.

After Mrs. Rude's death in 1944 Mr. Rude bought a house in Princeville and he and appellee lived there a short time. In August, 1944, appellee married Henry Tess. She was then 28 years of age. This marriage did not meet with her father's approval, and he thereafter refused to have anything to do with his daughter and especially with her husband, whom he disliked.

On October 19, 1945, William Rude married Gertie Crowe whom he divorced about one year later. In December, 1946, Rude made a will devising his real estate to the Trustees of the Presbyterian Church of Princeville, and the balance of his estate to his nephew, John Tess. In the summer of 1947, Clyde and Barbara Swinehart and their daughter moved into Rude's home with him and entered into an agreement with him whereby Swinehart was to farm the Rude land and they were to take care of him

and furnish him board until he died, in return for which Swineharts were to receive the Rude farm. At that time Rude made another will by which he devised his farm and household goods to Mrs. Swinehart, his residence to the church, $200 to his daughter, his automobile and securities to John Tess, and the residue to the church. The Swineharts lived with Rude for several months and then left, abandoning their agreement with him.

Thereafter, on January 8, 1948, Rude executed another will, which was probated in the probate court of Peoria County. By this will he disposed of all of his property except his farm to certain defendants who have not appealed from the decree of the lower court, and provided that his farm should be sold and $1000 paid to Kathleen Tess, $1500 to certain defendants who did not appeal, and of the balance 90 per cent to the Trustees of the Presbyterian Church of Princeville and 10 per cent to the Board of Foreign Missions of the Presbyterian Church of the U.S.A.

Points relied upon for reversal are that the evidence does not support the findings and is not so clear and convincing as to sufficiently establish the terms of the contract; that the contract was abandoned by appellee when she left her parents' home and went to Minnesota for a period of approximately eight months; that the services performed by appellee were not referable to the contract alone; that she did not change her position for the worse, and finally that she should be bound by the allegations of her original complaint that the contract was made on or about August 2, 1934, while the evidence shows that if such a contract was made it was made in 1932.

The law applicable to this case is well established by a great many decisions of this court. To justify the decree of the lower court the evidence must show beyond doubt that a contract was made and its terms must be clearly and convincingly established. (*Chambers* v. *Appel,* 392 Ill. 294;

*Hickey* v. *Hickey,* 374 Ill. 614; *Fierke* v. *Elgin City Banking Co.* 366 Ill. 66.) A mere expression of intention to convey property, which does not culminate in a binding agreement with mutual obligations, is not a contract that can be specifically enforced. (*Garren* v. *Shook,* 306 Ill. 154; *Williams* v. *Corcoran,* 346 Ill. 105.) Oral contracts to devise real estate or personal property are enforced in equity in certain cases, so as to furnish a more complete and fuller justice than that afforded by an action at law. (*Edwards* v. *Brown,* 308 Ill. 350.) The remedy is afforded where the contract has been fully performed by one party, but performance must be such that if the remedy is withheld it would be a fraud upon the promisee if the agreement were not carried out. (*Holsz* v. *Stephen,* 362 Ill. 527.) Where the Statute of Limitations bars a recovery at law, or where services performed are such that they cannot be adequately compensated for in an action at law the remedy of specific performance is available. Courts of equity scrutinize with the most scrupulous care the evidence offered in support of such a contract. Where there is a material conflict in the evidence as to the making or existence of a contract, or where there is a dispute as to the type of services performed, the court will not grant specific performance. (*Rigolio* v. *Knopf,* 390 Ill. 258; *Anson* v. *Haywood,* 397 Ill. 370.) Specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances in evidence. *Yager* v. *Lyon,* 337 Ill. 271.

Where one remains with a parent, or with a person standing in the relation of parent, after arriving at majority, and remains in the same apparent relation as when a minor, the presumption is that the parties do not contemplate payment of wages or other compensation for services. This presumption, however, may be overcome and the reverse established by proof of an express or implied contract. (*Heffron* v. *Brown,* 155 Ill. 322; *Warren* v.

*Warren,* 105 Ill. 568.) Where a child, upon approaching or reaching the age of its majority, enters into an agreement with a parent, or person standing in the relation of parent, whereby such parent verbally agrees to convey or devise real or personal property to such child in return for such child remaining with the parent and rendering services to such parent, and such child, pursuant to and in full and complete performance of such contract, stays with such parent and performs services over a long period of time after it attains its majority, and the services are of such a nature and have continued over such a long period of time that recovery of compensation in an action at law would be inadequate, and the existence of the contract is proved beyond a reasonable doubt and the terms thereof are clearly established, a court of equity will grant specific performance. *Warren* v. *Warren,* 105 Ill. 568; *Gladville* v. *McDole,* 247 Ill. 34.

We have carefully examined the testimony of all witnesses in the record. There is no dispute concerning the nature of the services rendered by Kathleen Tess to her father and mother. She performed a great deal of manual labor about the farm, feeding hogs, milking cows night and morning, pulling weeds in the fields, cleaning stables, picking corn, driving the tractor, unloading corn, shocking oats and generally doing the work of a man. In addition to this, she helped her mother with the household duties and after her mother became ill with arthritis and later with cancer she nursed and cared for her without outside help except occasional services volunteered by neighbors. The evidence is undisputed that this continued from 1932 until after the death of Mrs. Rude in 1944 and that similar services were rendered even before 1932. Even though such services could be adequately compensated in money it is apparent that appellee would be barred by the Statute of Limitations from recovering compensation for the greater part thereof in an action at law. It follows that specific

performance is a proper remedy if the existence of a contract has been established by satisfactory evidence.

On behalf of appellee, Robert N. Schindler testified that he had known the entire Rude family ever since they moved to Illinois from Iowa; that in the fall of 1932 he had a conversation with Rude and asked him why his girl was not going to high school and Rude replied, "She's not learning anything there, and I need her at home. I made a deal with her;" that Rude then told the witness that he told her if she would stay out of school, help on the farm, help take care of his wife the same as she had been doing during the sickness, and stay with them until the old lady died, and not marry until she was 25 she would get the farm and she would get everything when both were dead.

Claude Swinehart testified that he and his family moved in with Rude in 1947 at Rude's request and under an arrangement whereby they were to operate his farm and keep him until he died, in return for which they were to receive his farm; that, about a week after they moved in, Rude told him that he had agreed to give Kathleen his entire estate if she stayed home and helped him at home and took care of her mother until she was 25; that she was not to marry before that time; that Kathleen had married against his wishes and he was not leaving her anything but $200.

Samuel Burton testified that in 1940 Rude told him that this girl got all that he had at his death providing she stayed with him until she was 25 or until his wife passed away; that later Rude told the witness that since she got married he was going to recall everything he had given her, that she had no papers to show for anything, and that she, having married Tess, was not going to get anything and that he had destroyed the adoption papers.

Clarence Berg testified that he had a conversation with Rude in 1943 in which he stated "I have got things all

fixed up with Kathleen that when she—if she stays here till she is twenty-five and don't get married, why she's to get everything I got."

Lydia Seidel testified that she lived about one eighth of a mile from the Rude farm; that about a week before Mrs. Rude died the witness visited her; that Rude was present when Mrs. Rude said she was glad to be at home in her sickness and was so considerate of Kathleen's tender care; that Kathleen was not getting anything for her pay and was going to get the farm after they were both gone; that Rude then said, "I am going to follow in a few months, and Kathleen will get the farm."

Gertie Crowe, whom Rude married in 1945 and divorced in 1946, testified that prior to her marriage to Rude she asked him to turn the house or the farm over to her and that Rude said he had promised everything to Kathleen at his death; that he said he had promised her everything he had until then, but that he was mad at the man she married and was going to leave her only $300.

Ernest Aby testified that he had discussed with the Rudes their relationship with their daughter; that Rude said Katie was to get all he had when he died if she would stay with him until she was 25 years old.

Numerous other witnesses testified to statements made by Rude to the effect that Kathleen was to get everything he had when he died.

The testimony of the witnesses named above is not controverted. Appellants attack the credibility of some of these witnesses and point out discrepancies in dates and times fixed by some of them. It is well established that the master's conclusions of fact and the weight to be accorded certain parts of the evidence, when approved by the chancellor, will not be disturbed unless manifestly against the weight of the evidence. After carefully examining the record we are of the opinion that the existence

of the contract is sufficiently established and we cannot say that the master's conclusions were erroneous.

Appellants contend that Kathleen Tess failed to fulfill her contract and abandoned the same because she went to Minnesota in the fall of 1940 and did not return until May of the following year. We have carefully examined the evidence and find that there was no abandonment of the contract. The undisputed testimony shows that after the trial of the two youths suspected of taking their son's life Mr. and Mrs. Rude were fearful that something might happen to appellee and that she went to Minnesota at the request of her parents; that they deemed it essential to her health and that during a greater part of the time Kathleen was gone Mr. and Mrs. Rude also were away on a trip. There is no evidence whatever tending to show that there was an abandonment of the contract or any change in the relationship of the parties. After Kathleen returned, she performed the same services for her mother and father as she had before.

We also find from an examination of the evidence that the services performed by appellee are referable to the contract which she made with her father.

The contention that appellee should be bound by the allegations of her original complaint that the contract was made on or about August 2, 1934, and that therefore the lower court erred in finding that a contract was made in 1932 is without merit. The contract as established by the evidence is not substantially different from the contract alleged in the original complaint. The prayer of the complaint, in addition to asking for specific relief, also prayed for general relief and a court of equity may grant such relief as it may find plaintiff is entitled to under the proof. *Anson v. Haywood*, 397 Ill. 370.

The decree of the circuit court of Peoria County is affirmed.

*Decree affirmed.*