(No. 33294.—

EDWARD GALAPEAUX, Appellant, *vs.* CLARENCE A.
ORVILLER, Exr., *et al.*, Appellees.

*Opinion filed December 20, 1954.*

Philip G. Bixler, and Allen H. Meyer, both of Chicago, for appellant.

McCarthy, Witry, Lyon & McCarthy, of Chicago, (George R. Lyon, and Gregory J. Scheurich, of counsel,) for appellees.

Mr. Justice Daily delivered the opinion of the court:

This appeal, involving a freehold, centers around a Chicago residence property devised by Albert A. Orviller, deceased, to his nephew, Clarence. A. Orviller, the principal appellee. The action was started when the appellant, Edward Galapeaux, a nephew of decedent's wife, filed a complaint in the circuit court of Cook County praying for specific performance of an oral contract whereby decedent and his wife allegedly promised to execute a joint and mutual will by which the survivor would devise and bequeath their entire estate to appellant in return for his promise to give them care and medical services during their lifetime. At this point it should be noted that appellant's claim to property other than the residence was neither pursued nor passed upon in the circuit court and has been affirmatively abandoned in this court.

The cause was referred to a master in chancery who heard and reported the evidence and recommended that appellant be granted relief. The basis for the recommendation appears to have been twofold, first, that a preponderance of the evidence established the oral agreement, and, second, that regardless of the existence of such agreement,

a deed by which appellant surrendered a joint tenant's interest in the residence was fraudulent and unconscionable. The chancellor, however, sustained objections to the report and entered a decree dismissing the complaint for want of equity. This appeal has followed.

The factual background of the litigation shows that appellant, now a physician, came to live with decedent and his wife about 1924, when he was twelve years old. This event was occasioned by the death of appellant's mother, a sister of decedent's wife, combined with the inability of his father to then provide a home. Appellant lived with the Orvillers as a member of the family until 1942, and it appears that his father contributed to his support until the father's death in 1936, at which time appellant inherited approximately $3000, which was also used for his maintenance and education. In 1939, while a student in medical school, appellant married and thereafter both he and his wife lived with the Orvillers, continuing until 1942, when they rented a home of their own nearby.

There is some evidence, later detailed, that decedent and his wife executed a joint and mutual will late in 1942 which provided that the residence would go to the survivor of them and, upon the death of the survivor, to the appellant. Decedent's wife died in 1949, but the alleged will, which was never seen after its purported execution, was not probated. Very shortly after the wife's death, the decedent executed a will making certain money bequests to his nephew, appellee Clarence A. Orviller, to John Galapeaux, a brother of appellant, and giving the remainder of his property, including the residence, to appellant. Within a month after the execution of this will, decedent caused deeds to be executed which vested title to the residence in himself and appellant as joint tenants. At the time of this transaction, decedent is purported to have told the attorney who prepared the deeds, that he "wanted the property in Ed's [appellant's] name because he had taken care of us

all the time." After the execution of the deeds, decedent made a new will devising and bequeathing almost all of his property to appellant.

Approximately six months later, in April, 1950, the decedent apparently learned of the consequences of his deeds and had a change of heart and mind, for he informed the attorney who had drawn all the instruments previously referred to, that he wanted title to the residence to be restored to his name alone. As a result, appellant, joined by his wife, reconveyed to decedent. When decedent passed away on November 23, 1950, it was discovered that he had executed yet a later will bequeathing to appellant certain stocks and a bank account totalling approximately $7000 and giving the remainder of his property, including the residence, to his nephew Clarence, the appellee.

Appellant's first reaction when the latter will was admitted to probate was to file a claim of $5000 for medical services against the estate but such claim was later withdrawn and this proceeding to enforce the alleged oral agreement to devise the decedent's property was commenced. In seeking reversal of the lower court's decree denying equitable relief, appellant's main contentions are: first, that the evidence establishes the existence of the oral agreement, its fairness, the adequacy of consideration and performance by appellant so as to entitle him to specific performance; and, second, that the deed by which he reconveyed his joint interest in the residence to decedent was obtained by fraud and, in equity, should be set aside.

In considering the contention that equity should decree specific performance of the alleged oral contract to devise, we are to be guided by the cautionary rules and equitable principles which have developed from innumerable cases of this nature and which are succinctly summarized in *Linder v. Potier,* 409 Ill. 407, 411, as follows: "(1) Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a

deceased person different from that provided by law; (2) The contract to support it must be clear, explicit and convincing; (3) The contract may be based upon services, support and care, and if the value of such services may be estimated in money, or for which a recovery might be had, such performance will not take the contract out of the Statute of Frauds, except in case the statute of limitations bars recovery, or where services cannot be adequately compensated; (4) Specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all of the facts and circumstances; (5) It is only on the principle that it is unjust and inequitable to permit a contract to remain unexecuted that a court of equity will grant relief, and where the promisee shows no substantial change for the worse in his position in consequence of the agreement, relief will be denied."

Our attention in this cause shall be first directed to the principle that the evidence necessary to support a decree of specific performance must be clear, explicit and convincing. In this regard, we have held that the proof upon which conveyance is asked must establish the parol contract in certain, definite and uniequivocal terms and be so convincing that it will leave no reasonable doubt in the mind of the court. *Williams* v. *Corcoran,* 346 Ill. 105, 106.

To prove his claim of an oral contract, appellant produced several witnesses who testified regarding the close and affectionate relationship between appellant and the Orvillers and told of their intention, expressed sometimes by decedent but principally by his wife, to leave their entire estate to appellant. We have, however, frequently held that a mere expression of an intention to make a gift of property, which does not culminate in a binding agreement with mutual obligations, is not a contract that can be specifically enforced. (*Tess* v. *Radley,* 412 Ill. 405, 411; *Williams* v. *Corcoran,* 346 Ill. 105, 107.) The only witness for appellant who testified to an "agreement" was the attor-

ney and long-time friend of the Orvillers and appellant, who prepared all the documents previously described except the will of decedent that was admitted to probate. The first of the references, which is extremely sketchy and inconclusive, is found in the attorney's account of a conversation at a social occasion in 1942, attended by decedent, appellant, the attorney and their wives, wherein the Orvillers remarked that they were happy over appellant's success, that "they wanted to help him out, he was going to take care of them, and, of course, if he would, they agreed everything would go to him in the event of their death." In describing another conversation which occurred in 1949, the attorney stated: "Mrs. Orviller said Ed was taking care of them so nice; he was in there all the time; they agreed if he would keep it up they were going to see he got all their property." Another mention of an "agreement" came from a witness for appellees who testified that in 1949 during a conversation about making a will, decedent said: "I am going to make one out. I had an agreement with my wife her nephew would get the house if I died first but if she died first my nephew would get the house."

While the evidence detailed suggests the possibility of some agreement between the decedent and his wife, it does little to establish, with the clarity required, an explicit oral contract with appellant. It is our opinion, too, that further testimony of the attorney tends to negative the existence of an agreement that appellant was to receive "all" of decedent's property. The attorney testified that when decedent executed a will shortly after his wife's death, he discussed with the witness and appellant the amount of a money bequest to appellee and that such a bequest was in fact made. In telling of the occasion, the attorney stated he advised decedent about the necessity of making a bequest to appellee in these terms: "No you don't have to do anything. This is your money and your property."

Neither the attorney's advice nor the appellant's participation in the determination of the amount of the bequest would indicate that either considered decedent bound by a contract by which he was to give all his property to appellant.

It is next urged that the joint and mutual will allegedly executed by decedent and his wife was made pursuant to the contract with appellant and is evidence of the existence of the agreement. The attorney testified that at a dinner party in 1942, decedent's wife opened the subject by remarking: "We ought to draw a will so that if anything would happen to one of us the other would get it." The witness stated he got the facts from them and subsequently drew a joint and mutual will the terms of which provided that all their property was to go to appellant upon the death of the survivor of them. Although the attorney stated he drew but one joint will for the Orvillers, we find that he made conflicting statements as to its execution and disposition. First he said: "They never went through with it;" next he said he did not know what happened to the will after he turned it over to decedent; and in another instance he testified "That first will was executed by a friend of theirs by the name of Glynn, something like that." With respect to the latter statement, Louise Glynn, for many years a neighbor to the Orvillers, testified that she and her husband had been called to the Orviller residence to witness a will approximately ten or eleven years prior to the date of her testimony. She stated there was but one instrument which both the Orvillers signed, and that Mrs. Orviller "said the will was in favor of Edward, and that the house and all that was in it was going to be Edward's." It is our opinion that this evidence also is not of the clear and convincing quality that must surround the proof of an oral contract to devise.

Appellant further argues that the decedent's act of creating a joint tenancy with appellant in the residence

was also a manifestation of the existence of the agreement, and was done in performance of it. Such an argument is completely met by testimony of the attorney which fully demonstrates that decedent had no knowledge of the legal effect of his deed and that when such knowledge was acquired, decedent took immediately steps to have title returned to his name. Briefly, the attorney testified that decedent wanted the property reconveyed to him because he had learned that the effect of his deed to appellant was to deprive him of ownership of the property and of the power to sell it if he so desired. In the light of this testimony it is difficult to conceive that decedent's conveyance was made with any knowledge or intention of fulfilling the asserted oral contract with appellant. Indeed, in telling of the conversation in which decedent said he wanted a reconveyance, the attorney testified he stated to decedent: "If you ever want to sell it, Ed would sign." We think this evidence not only negatives a presumption that decedent had conveyed to appellant pursuant to a contract, but also the very existence of the contract.

Apart from the shortcomings of appellant's proof, there are other circumstances in the record which, collectively, tend to disprove the existence of the oral contract·claimed by appellant. First of all, the final will of the decedent, which is out of harmony with the asserted oral contract, may be taken into consideration as bearing upon the improbability of the contract. (*Fierke* v. *Elgin City Banking Co.* 366 Ill. 66.) We think the same may be said here of the frequency with which the decedent changed his wills. There is also testimony that decedent felt he had done enough for appellant and that he wanted to give his property to appellee, his only blood relative. Still another circumstance is the fact that appellant first filed a claim against decedent's estate for services rendered. While not conclusive evidence that the parties did not make an agreement, such action has been held to be so incon-

sistent with a definite and clear contract as to detract materially from the claim that such a contract was made. *Wrestler* v. *Tippy*, 280 Ill. 124; *Moreen* v. *Estate of Carlson*, 365 Ill. 482.

Upon a careful examination of the entire record we are compelled to hold that the proof is not such as is required to establish a valid and enforceable contract upon which to base a decree for specific performance. The chancellor therefore properly denied such relief.

The second contention of appellant is that the deed by which he reconveyed his joint interest in the residence to decedent was induced by fraud and misrepresentation and should be set aside. Relief may be granted under a general prayer only when it is consistent with the facts alleged and proved, provided it does not take the defendant by surprise. (*Kelly* v. *Kelly*, 293 Ill. 169; *VanZanten* v. *Van Zanten*, 269 Ill. 491.) Though appellant interprets his complaint to the contrary, we do not find any allegations which, even under the most liberal of constructions, would cause us to be so indulgent as to permit his complaint to serve the purpose he now desires. The complaint is completely devoid of any allegations that the deed in question was induced by fraud or misrepresentation and such an issue could only have come as a complete surprise to the defendants. Moreover, the testimony in the record relating to the issue of fraud is not of the clear, convincing and satisfactory quality necessary for the relief of setting aside a deed.

The decree of the circuit court of Cook County dismissing the cause for want of equity was correct and is affirmed.

*Decree affirmed.*