*In re* BRYANT JONES, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MELVYN ALLEN, Respondent-Appellant.)

*In re* CRYSTAL HYMN JONES, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MELVYN ALLEN, Respondent-Appellant.)

(No. 60776; )

First District (2nd Division)—December 9, 1975.

Kenneth N. Flaxman, of Durham, North Carolina, for appellant.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner and Alan L. Fulkerson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This appeal is by a putative father who while serving a penitentiary sentence of 15 to 25 years was found an unfit parent because during his imprisonment he failed to maintain a reasonable degree of interest, concern and responsibility for the welfare of his illegitimate children. The finding was made after petitions were filed praying for an order terminating the inmate's parental rights and appointing a guardian authorized to consent to adoption of the children. The trial court, sitting without a jury, heard evidence and entered orders in accordance with the prayers in the petitions. The issue presented is whether the evidence presented to the trial court supported its finding that the inmate was an unfit parent. Resolution of this issue requires a recital of the material facts.

I.

For some time prior to September 1964, Melvyn Allen and Kathryn Jones, without benefit of marriage, lived as man and wife in the city of

Chicago. As a result, two children were born to them: Bryant on September 8, 1964; Crystal Hymn on October 24, 1965. In February 1969, Allen killed Kathryn Jones. Since that time, he has been incarcerated, first in jail awaiting trial; since July 1970, in the penitentiary serving his sentence.

Bryant and Crystal, on the death of their mother, were taken into the home of an aunt. Then, on June 30, 1969, on petitions filed by the county director of public aid, the juvenile division of the Cook County circuit court found them dependent minors because they had no parent or relative to care for them. They were placed in a foster home. Allen was not a party to these proceedings. In fact, he was neither notified nor served with process.[1] The two children remained wards of the State, but those who supervised their foster home did not know Allen's address.

Then, in August of 1973, an employee of the Illinois Department of Children and Family Services discovered that Allen was in the penitentiary and conveyed to him a request that he consent to the children's adoption by their foster parents. Allen refused. Consequently, in the same proceedings in which Bryant and Crystal had been made State wards, supplemental petitions were filed naming Allen a respondent and alleging that he was an unfit father because he had failed to maintain a reasonable degree of interest, concern and responsibility in the children's welfare. On May 9, 1974, the petitions were called for hearing. Allen was summoned; and, represented by counsel, was present.

Three witnesses gave all the evidence in the case. They were Allen, who testified twice, once as an adverse witness and once on his own behalf; the agency employee who located him, and Allen's mother. After all the evidence was heard, the trial judge asked the State to waive argument, but invited Allen's counsel to summarize his case. Counsel did so and argued that Allen had not been proven an unfit parent. When counsel concluded, the trial judge invited the guardian *ad litem*, a lawyer who until then had not participated in the proceedings, "* * * to argue against a finding of unfitness." The invitation was accepted and the guardian said that he joined in the argument which had been made in Allen's behalf.

After this statement was made, the trial judge again said he did not want to hear from the State and proceeded with his findings, saying:

> "This, of course, as so many cases that are brought before this Court, is a tragic case. Apparently the father, at this point, does

---

[1] This was understandable because at the time, under Illinois law, Allen, a putative father, had no parental rights with regard to his illegitimate children. (Ill. Rev. Stat. 1969, ch. 4, par. 9.1—8(e); Ill. Rev. Stat. 1969, ch. 106¾, par. 62.) The applicable statute provided that an illegitimate child had only one parent, the mother. Ill. Rev. Stat. 1969, ch. 4, par. 9.1—1E.

wish to assert his rights and his interest in the children as being flesh of his flesh.

However, the Court must be concerned about the best interest of the children who have been in a foster home since '69. They are entitled to stability in their lives; they are entitled to a proper home.

The Court finds the father, despite the fact he may have written to the aunt, has not done all he might have done. He had his own relatives on the outside. If he really was concerned about the children—he knew the mother was dead, and if he wrote the sister and did not get a response, then it was incumbent upon him to have his relatives go by and contact the sister to find out where the children were, long before, long before now."

The court went on and rejected the argument made by Allen's counsel. It decided that " * * * there will be a finding of unfitness for failure to maintain a reasonable degree of concern and responsibility as to these childrens' [sic] welfare." In this court, Allen, by the same lawyer who represented him in the trial court, reasserts the argument that the evidence which the court heard did not prove he was an unfit parent. The State argues that the evidence proved Allen's unfitness as a parent because in his testimony he admitted that he did not write to the children until late in 1970 or early in 1971, nearly two years after his arrest in February 1969. Thus, the State insists, it was shown that Allen did not maintain a reasonable degree of interest, concern and responsibility for the children's welfare.

## II.

In resolving the issue thus presented, certain distinctive features of this controversy assume importance. For example, as the putative father of Bryant and Crystal, Melvyn Allen, at the time they were made wards, had no parental rights under the law of Illinois. (*DePhillips v. DePhillips*, 35 Ill.2d 154, 219 N.E.2d 465; Comment, *Rights of a Father Toward His Illegitimate Child in Illinois*, 46 Ill. L. Rev. 156 (1951); Annots., 45 A.L.R. 3d 216 (1972), 15 A.L.R. 3d 887, 891-92 (1967).) In fact, when this court decided *Wallace v. Wallace*, 60 Ill.App.2d 300, 210 N.E.2d 4, we observed that from the legislature's view of an illegitimate child's relations with its father, the father's duties equalled those of males who were fathers of legitimate children; but the father of an illegitimate child did not enjoy any of the rights of the father whose child is born in wedlock. (60 Ill.App.2d 300, 303.) In 1972, however, the United States Supreme Court decided that Illinois could not, consistent with the Federal constitution, so define parental rights that without a hearing a puta-

tive father could be deprived of his interest in the care and custody of his illegitimate children. (*Stanley v. Illinois* (1972), 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208; see *People ex rel. Slawek v. Covenant Children's Home*, 52 Ill.2d 20, 284 N.E.2d 291.) As a result, the Illinois legislature amended the applicable statute and defined persons having parental rights broadly enough to include putative fathers. (See Ill. Rev. Stat. 1973, ch. 4, par. 9.1—1E; Comment, *New Adoption Proceedings in Illinois*, 7 John Marshall J. Prac. & Proc. 194 (1973).) This change in the law took effect October 1, 1973. On that day and for the first time, therefore, Allen, as to his illegitimate children, acquired parental rights which the laws of Illinois would protect. Before then, since Bryant and Crystal were State wards, Illinois juvenile authorities would not have accepted Allen's letters to them, or visits on his behalf by relatives, as valid assertions of parental rights. See *In re Stanley*, 45 Ill.2d 132, 256 N.E.2d 814; *Vanderlaan v. Vanderlaan*, 126 Ill.App.2d 410, 262 N.E.2d 717; see Comment, *Disposition of the Illegitimate Child—Father's Right To Notice*, 1968 U. Ill. L.F. 232.

■■■ With this fact in mind, we notice that this was not a custody proceeding; it was one brought for the sole purpose of determining whether Allen was an unfit parent. Custody and adoption proceedings are to be distinguished. (See *Jackson v. Russell*, 342 Ill.App. 637, 97 N.E.2d 584.) In a custody proceeding, the controlling question is what is for the best interests of the child. (*Giacopelli v. Florence Crittenton Home*, 16 Ill.2d 556, 158 N.E.2d 613.) In an adoption proceeding, the relief sought cannot be awarded solely on the basis of what is in the best interests of the child. (*In re Cech*, 8 Ill.App.3d 642, 291 N.E.2d 21.) An adoption severs the rights and interests of natural parents; its permanently terminates the relation between parent and child. (*In re Schuman*, 22 Ill.App.3d 151, 319 N.E.2d 287; see Ill. Rev. Stat. 1973, ch. 37, par. 705—9(2).) The basis for this severance, this termination of relation, has to be one of the statutory grounds defining unfitness, some act or omission on the part of the parent. For these reasons, it is the settled law of this State that in order to terminate parental rights, parental unfitness must be shown by clear and convincing evidence. (*In re Overton*, 21 Ill.App.3d 1014, 316 N.E.2d 201; *In re Deerwester*, 131 Ill.App.2d 952, 267 N.E.2d 505.) Clear and convincing evidence means proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth of the matter in issue. (See *Galapeaux v. Orviller*, 4 Ill.2d 442, 123 N.E.2d 321; *In re Estate of Weaver*, 75 Ill.App.2d 227, 220 N.E.2d 321; compare *People v. Ralls*, 23 Ill.App.3d 96, 318 N.E.2d 703.). And in determining whether in this case parental unfitness was proved by clear and convincing evidence, we bear in mind that the trial court's

finding should not be disturbed unless it is contrary to manifest weight of the evidence (*Thorpe v. Thorpe*, 48 Ill.App.2d 455, 198 N.E.2d 743); that the credibility of witnesses is a matter we must leave to the trier of the facts (*Garrett v. Babb*, 24 Ill.App.3d 941, 322 N.E.2d 217); and that reviewing courts of this State insist that a clear case establish the statutory ground for termination of parental rights before the best interests of the child or children can be considered (*Kubisz v. Johnson*, 29 Ill. App.3d 381, 329 N.E.2d 815). We turn to the evidence in the record.

As presented, it began with documentary proof that Kathryn Jones, the children's mother, was dead. Then, Allen was called as an adverse witness. He told the court that he had been a penitentiary inmate since July 1970; and before that, he had been incarcerated awaiting trial. He admitted that Bryant and Crystal were his children, although he never married their mother. He accepted responsibility for her death. Allen said that before his arrest in February 1969, he contributed to the children's support by working part-time as a painter. He told of having heard during his trial that Bryant and Crystal were living with Barbara King, their mother's sister. Based on this information, after he arrived in the penitentiary, he wrote to them at the aunt's home three or four times each year and sent them Christmas gifts through the social facility services of the Salvation Army. He said his letters were never answered; but he thought this was to be explained by the understandable attitude the aunt had toward him since he had killed her sister. Then, after being contacted and asked to consent to the children's adoption sometime in the fall of 1973, Allen said he wrote to Joyce Salter, the social worker in the Illinois Department of Children and Family Services. Over objections of his counsel, Allen was asked and he was required to answer a question which revealed he expected to be eligible for parole in three years.

Joyce Salter, was the next witness for the State. She told the trial judge that the social service files of Bryant and Crystal were under her supervision. She said that the children were then in the same foster home in which they had been placed in 1969. Bryant, who was five years old when he became a State ward was now nine; Crystal, who was four was now eight. Ms. Salter said that during the time the two children had been State wards, they had had no contact with Allen. The agency files contained no information concerning him; and these disclosed that no notice of what had been done for Bryant and Crystal was ever communicated to him by the State. She said she located Allen from information she acquired through authorities in the Cook County Jail in Chicago. Then, in the fall of 1973, for the first time to her knowledge, Allen contacted the department regarding the children. The foster parents, Ms. Salter told

the court, were willing to adopt the children. With the conclusion of her testimony, the State rested its case and Allen started his.

He testified on his behalf and reiterated the substance of his testimony as an adverse witness. Under cross-examination, he said that while awaiting trial in the County Jail he did not write to his children. His letters to them began after he reached the penitentiary in July, 1970, or early 1971. He told the judge that after he learned from the communication he received in the penitentiary telling him that the children were in a foster home, he asked his brother to find them. At about that time, he inquired of his mother if she would be willing to take them into her home. When he was cross-examined by the guardian *ad litem*, Allen said he was 34 years of age; and that while in the penitentiary, he had not asked a chaplain there to make inquiries on his behalf concerning Bryant and Crystal.

His mother, Serita Allen, testified next. She told the trial judge that when her son was first arrested, she, too, thought that the two children were living with a relative; but in November of 1973 she learned that this was not the case. The testimony of this witness concluded the hearing of evidence. And based on it, the trial judge found Allen an unfit parent because he had failed to maintain a reasonable degree of interest, concern or responsibility in the welfare of his children.

This finding serves to focus our attention on the fact that when the supplemental petitions were filed and Allen was required to appear and defend, he was a penitentiary convict who had been sentenced for the murder of the woman who had given birth to his illegitimate offspring, the children whose adoption he had refused to approve. However, his conviction was not relevant or material to the State's charge that he had failed "to maintain a reasonable degree of interest, concern or responsibility as to [his children's] welfare." (See Ill. Rev. Stat. 1973, ch. 4, par. 9.1—1D(b).) Whether Allen had committed a murder in 1969 for which he was convicted would not tend to prove that while serving his sentence he failed to maintain an interest in his children. That conviction, however, along with other evidence, may have tended to prove that Allen was an unfit parent because of depravity. (See *Stalder v. Stone*, 412 Ill. 488, 107 N.E.2d 696; *Smith v. Andrews*, 54 Ill.App.2d 51, 203 N.E.2d 160; Ill. Rev. Stat. 1973, ch. 4, par. 9.1—1D(h).) But that ground of parental unfitness was not alleged by the State. (Compare *Young v. Prather*, 120 Ill.App.2d 395, 256 N.E.2d 670.) And no amendment was offered in order to conform the pleadings to the proof of Allen's conviction. Certainly, the trial court did not rule on a ground that made depravity an issue. Therefore, that question, or one which concerned Allen's

conviction, is not before us. See *In re Smith*, 4 Ill.App.3d 261, 280 N.E. 2d 770; compare *In re Flynn*, 22 Ill.App.3d 994, 318 N.E.2d 105.

This cannot be said of Allen's incarceration. As a matter of common sense, we know that incarceration of a person, father or mother of legitimate or illegitimate children, limits, indeed it seriously impairs, the ability of that person to manifest interest, concern or responsibility in the welfare of his or her children. For this reason, the fact of incarceration is relevant to the question whether during imprisonment that parent has maintained a reasonable degree of interest in the welfare of his children. So does the fact that the children of an incarcerated parent have been placed by the State where contact between the parent and the child is frustrated by State authorities.

Recently, in *In re Taylor*, 30 Ill.App.3d 906, 334 N.E.2d 194, we considered the case of an incarcerated mother who was charged with having failed to maintain a reasonable degree of interest, concern or responsibility in the welfare of her children. There, as in the case before us, the children had been made wards of the State; but by decision of responsible employees in the Department of Children and Family Services, the mother was not told the address of her children's foster home. Her efforts to contact her children were thus frustrated by agency employees. She was found to be an unfit parent under the same section of the adoption act on which the State relies in this case. We reversed the trial court, holding that where the circumstances showed the mother had been incarcerated "* * * it is her efforts to carry out her parental responsibilities, rather than their success, which should be considered in determining the correctness of a finding of unfitness under subsection D(b), particularly where, as here, it is alleged that the respondent's attempts to fulfill her duties were prevented by the policies or personnel, or both, of the Department." (30 Ill.App.3d 906, 909.) See *In re Overton*, 21 Ill.App.3d 1014, 316 N.E.2d 201; *In re Moriarity*, 14 Ill.App.3d 553, 302 N.E.2d 491; *In re Deerwester*, 131 Ill.App.2d 952, 267 N.E.2d 505.

In this case, State juvenile authorities, acting under a statute that was later declared unconstitutional, took Allen's two illegitimate children without notice to him and moved them from a home where he thought they were to a foster home about which he was kept ignorant by the State. Therefore, his failure to contact his children can be easily understood. Allen's testimony that he did not know Bryant and Crystal were in a foster home was corroborated by the only witness who appeared against him. Ms. Salter, who located him in the penitentiary, testified that the social service files of the two children disclosed no contact with Allen prior to August 1973 when a routine inquiry revealed where he was. Allen's testimony that he wrote to his children two or three times a

year from the penitentiary and sent them Christmas gifts, was not denied by anyone nor contradicted by any evidence. We do not attach the same importance as does the State to his frank admission that while he was awaiting trial he did not write to the children.

■■ As we have pointed out, our law requires that before parental rights are terminated, parental unfitness as defined by statute must be proved by clear and convincing evidence. (See *Kubisz v. Johnson*, 29 Ill.App.3d 381, 329 N.E.2d 815; *In re Schuman*, 22 Ill.App.3d 151, 319 N.E.2d 287.) In our judgment, the record before us does not meet this requirement. The evidence presented to the trial court did not support its finding that Allen was an unfit parent within the statutory definition alleged in the supplemental petitions. (Compare *In re Perez*, 14 Ill.App.3d 1019, 304 N.E.2d 109.) Therefore, we reverse the order that terminated Allen's parental rights and appointed a guardian to consent to the adoption of Bryant and Crystal Jones. And because the children involved are wards of the court, a status not affected by this appeal, we remand the causes for further proceedings not inconsistent with the views expressed in this opinion.

Reversed and remanded with directions.

DOWNING, P. J., and STAMOS, J., concur.