In re LAWRENCE P. WHITEHOUSE.—(THE PEOPLE ex rel. RALPH W. HAY, Petitioner-Appellee, v. LAWRENCE P. WHITEHOUSE, Respondent-Appellant.)

Fifth District  No. 76-220

Opinion filed December 23, 1977.

Richard J. Habiger, of Prison Legal Aid, of Carbondale, for appellant.

William A. Schuwerk, Jr., State's Attorney, of Chester (Bruce D. Irish and Martin N. Ashley, both of Illinois State's Attorneys Association, of counsel), for appellee.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Respondent appeals from a judgment of the circuit court of Randolph County finding him to be a person in need of mental treatment and ordering his commitment to the Chester Mental Health Center pursuant to the Illinois Mental Health Code (Ill. Rev. Stat. 1975, ch. 91½, par. 1—1 et seq.). The only question in this cause is whether the judgment of the trial court was supported by clear and convincing evidence.

Respondent was admitted to the Chester Mental Health Center on February 12, 1976. On February 13 he was examined by Leonard Horecker, M.D., a staff psychiatrist for the Chester Mental Health Center. On the basis of a 45-minute interview with respondent, the doctor recommended that the State petition the appropriate circuit court to order the commitment of Lawrence Whitehouse to the Department of Mental Health under the civil code as a person in need of mental treatment (Ill. Rev. Stat. 1975, ch. 91½, par. 1—11). According to the certificate completed by Dr. Horecker, respondent had been charged with reckless homicide, found unfit to stand trial, and remanded by the court to the Department of Mental Health. He also noted that although he and Dr. Boyd had previously examined respondent and determined that he was fit to stand trial on a charge of reckless homicide, "seemingly things must have taken a turn for the worse within the patient because the court did find him unfit to stand trial. As I see him today I can see that he is unable to cooperate with counsel in his own defense and consequently is unfit to stand trial at this time." Dr. Horecker's diagnosis of respondent's mental condition as stated on the "Certificate of Need for Hospitalization" was as follows:

> "The patient has many paranoic colored ideas about many people in Wabash County that seem to form the basis of a delusional

system. Ideas of reference are very strong. I could not elicit that he was hallucinating in the auditory sphere, however. * * * This patient certainly does have mental retardation which I think is mild and could be listed as a second diagnosis. The first diagnosis, I believe, considering the things that came out today, would have to be schizophrenia, chronic undifferentiated type. * * * The patient is mentally ill and in need of hospitalization and treatment. The patient is rambling, tangential, confused, hostile, and would not be able to take care of himself in a meaningful way. In addition, it is my impression that he is potentially dangerous to others."

A hearing on the petition for the hospitalization of the respondent was held on March 10, 1976. Appointed counsel for respondent requested the appointment of an independent psychiatrist at State expense to examine and testify on behalf of Mr. Whitehouse. This request was denied by the court. In response to an inquiry by respondent's counsel, the court indicated that the State would have to prove its case for hospitalization by clear and convincing evidence.

Dr. Horecker testified that at the February 13 examination the respondent was alert and recognized him from the previous examination. The respondent had a constant grin on his face but his tone was hostile as he talked about various officials in Mt. Carmel who he claimed were constantly causing him difficulty and trying to run him out of town. He then related the respondent's description of the incident which was the subject of the reckless homicide charge. On the night of the accident respondent had been driving a tractor with a wagon attached. Respondent recalled that a person riding a motorcycle had run into the wagon and subsequently died. The doctor testified that respondent had said the wagon was equipped with a flare, but that the sheriff had taken it off after the accident, just to get him in trouble. Dr. Horecker then testified that at the February 13 interview he found that the respondent "had many, many paranoic colored ideas about the sort of people in Wabash County and that although he did not have a systemized form of delusional system, his ideas were very fixed and I could not shake them." He also stated that the respondent felt people were saying bad things about him behind his back. He added that respondent was illiterate and that at times during the February 13 interview he was rather grandiose, and that this indicated a mild mental retardation. Although he stated that he had discovered the same paranoid ideas in the earlier examination, he testified that he and Dr. Boyd believed that respondent was not psychotic at that time but that in the interim between the two examinations, he had developed an active psychosis. He testified that his diagnosis of the respondent was that "he was mentally ill and in need of hospitalization and treatment because he is rambling, tangential, confused and hostile.

He is not really able to take care of himself appropriately in a meaningful way. I also have the impression he is potentially dangerous to others, but largely I am saying he is not able to take care of himself and needs to be hospitalized." Further testimony established more clearly that respondent was committed to the Mental Health Center for the sole reason that he was unable to take care of himself.

Respondent testified that he lived alone in a houseboat on the river and that he took care of his grandmother who lived in a nearby trailer. He had only completed the first grade and had joined the army at the age of 18 and served for three years. His grandmother received on his behalf some social security benefits and also a monthly check for $300, apparently for a service-related disability. He had a demolition business and he tore down old silos and barns for a charge of $300 each. He stated, "I drive a tractor and wagon. I make my own money. I don't go out and burglarize and steal it. Every dollar I make, I earn." He further testified that one week he tore down three barns and one big silo. That is what he used the tractor and wagon for.

When asked about Dr. Horecker's testimony that he was hostile toward the sheriff and the State's attorney of Wabash County, he responded that he was angry at them because he was arrested on his own property without a warrant. He was then asked whether this anger might cause him to be violent toward the sheriff, to which he replied, "No. I don't hurt him or nothing like that. All I got mad at him about, because he wasn't reading me my rights."

On cross-examination he stated that the authorities in Mt. Carmel had it in for him. He testified he used to drink a lot, four or five bottles of beer a day, and that he had been picked up a number of times for public intoxication. He said he saw no reason for being picked up so many times and stated that this was the reason he thought the authorities were out to get him. He also stated that a few years earlier someone had broken into his houseboat, but that "the law would never do nothing about it." When asked whether he had ever been in any fights when he drank, he responded that he had never been in a fight. He also testified that he had slacked up on his drinking and that he had had only two beers on the night of the accident.

On redirect examination the respondent stated that he understood that if the court did not commit him to the Mental Health Center, he would have to stand trial for reckless homicide. He then indicated that he wanted to face those charges, stating, "If I done it, I want the man to prove it to me."

At the close of the hearing respondent's counsel moved to dismiss the petition for hospitalization on the ground that the State failed to meet its burden of proving by clear and convincing evidence that Mr. Whitehouse

was a danger to himself or others or that he could not care for himself. The motion was denied and the court made the following statement:

> "Well, this is probably one of those situations where you would really wish possibly that there were available an independent evaluation. On the basis of Dr. Horecker's testimony I am going to find Mr. Whitehouse in need of mental treatment."

Counsel for respondent then inquired as to the specific basis of this finding and the court responded that it was because Whitehouse was dangerous to himself. The court then found respondent to be in need of mental treatment and ordered his commitment for treatment.

The Mental Health Code (Ill. Rev. Stat. 1975, ch. 91½, par. 1—11) defines persons in need of mental treatment as

> "* * * any person afflicted with a mental disorder * * * if that person, as a result of such mental disorder, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs."

In order to establish that a person is in need of mental treatment, the State must first prove that a person is suffering from a mental disorder. (*In re Love*, 48 Ill. App. 3d 517, 363 N.E.2d 21; *People v. Ralls*, 23 Ill. App. 3d 96, 318 N.E.2d 703.) In addition, the State must also produce an explicit medical opinion concluding that as a direct result of mental illness a person is unable to care for himself or is potentially dangerous to himself or others. (*People v. Bradley*, 22 Ill. App. 3d 1076, 318 N.E.2d 267; *In re Stephenson*, 67 Ill. 2d 544, 367 N.E.2d 1273.) The medical opinion upon which a commitment order is based must be derived from direct observation of the person to be committed. *People v. Bradley*, 22 Ill. App. 3d 1076, 318 N.E.2d 267.

The Illinois Supreme Court recently held that the appropriate standard in a civil commitment proceeding is clear and convincing proof. (*In re Stephenson*, 67 Ill. 2d 544, 367 N.E.2d 1273.) The court determined that the clear and convincing standard "requires a high level of certainty before finding an individual in need of mental treatment and curtailing his liberty, but does not place an impossible burden on the State in proving its case." (67 Ill. 2d 544, 556-57.) This clear and convincing evidence standard is applicable in a variety of contexts and a number of Illinois decisions have discussed the essential requisites of the standard. It is generally held that in order to satisfy the standard a fact must be established "in certain, definite and unequivocal terms and be so convincing that it will leave no reasonable doubt in the mind of the court." (*Galapeaux v. Orviller*, 4 Ill. 2d 442, 446, 123 N.E.2d 321, citing

*Williams v. Corcoran*, 346 Ill. 105, 106, 178 N.E. 348.) The Illinois formulation of the clear and convincing standard is consistent with that of most jurisdictions. As noted in 30 Am. Jur. 2d *Evidence* §1167, a general rule is

> "* * * clear and convincing evidence means that the witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order so as to enable the trier of the facts to come to a clear conviction without hesitancy of the truth of the precise facts in issue."

■■ Thus, although the clear and convincing standard does not place an impossible burden on the State in proving its case in a civil commitment proceeding, the State's evidence must nevertheless be so clear as to leave no reasonable doubt in the mind of the court that a person is suffering from a mental illness and that he is in need of medical treatment, either because he is unable to care for himself, or because he is dangerous to himself or others. Moreover, since the State must support its petition for hospitalization with an explicit medical opinion, "[t]he facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing." *People v. Sansone*, 18 Ill. App. 3d 315, 326, 309 N.E.2d 733.

■■ In this cause there was no evidence to establish the facts upon which Dr. Horecker's opinion was based. Therefore, the trial court erred in finding the respondent to be a person in need of mental treatment.

Respondent has also asked us to hold that an indigent respondent has a constitutional right to the appointment of an independent psychiatric expert at State expense. We refrain from passing on this question because it is not necessary to our decision in this cause. However, see *In re Gannon*, 123 N.J.Super. 104, 301 A.2d 493; Farrell, *The Right of an Indigent Civil Commitment Defendant to Psychiatric Assistance of His Own Choice at State Expense*, 11 Idaho L.Rev. 141 (1975).

For the foregoing reasons the judgment of the circuit court of Randolph County is reversed.

Reversed.

EBERSPACHER, P. J., and CARTER, J., concur.