(No. 48390.

*In re* CHARLES STEPHENSON, Appellant.—(The People of the State of Illinois, Appellee.)

*Opinion filed September 20, 1977.*

548

Michael J. Rovell, Jeffrey D. Colman, and Lisa Salkovitz, of Chicago (Jenner & Block, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, and Henry A. Hauser and Timothy Szwed, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The Cook County grand jury returned indictments charging that defendant, Charles Stephenson, murdered two persons. Subsequent proceedings resulted in a January 3, 1974, finding that he was unfit to stand trial, and his confinement in a State institution pending recovery. On January 10 a petition alleging defendant to be in need of mental treatment was filed accompanied by the certificates of two psychiatrists, both stating defendant was in need of hospitalization on an emergency basis because he was, in the words of one doctor, a "[p]ossible danger to self if depression increases in severity" and, as stated by the other, was "likely to physically harm others unless hospitalized." Following a February 15 evidentiary hearing defendant was found to be in need of mental treatment and committed to the Department of Mental Health for care and treatment in the Manteno State Hospital.

Defendant appealed and the Appellate Court for the First District affirmed. (36 Ill. App. 3d 746.) We allowed defendant's petition for leave to appeal, and now consider whether the due process requirements of the Federal and State constitutions in involuntary commitment proceedings are satisfied by a standard of proof less demanding than the proof beyond a reasonable doubt standard applicable to criminal trials. The trial judge in this case believed proceedings for the commitment of the mentally ill were civil in nature, thus permitting the use of the ordinary preponderance of the evidence standard. The appellate court disagreed, holding that the indefinite loss of personal liberty which could result necessitated the more stringent standard of clear and convincing evidence. That court held, however, that the evidence before the trial court clearly and convincingly established defendant's need for mental treatment and accordingly affirmed the judgment.

While it could be argued the issue is moot since defendant is no longer subject to the judgment being reviewed, the issue is a constantly recurring one upon which judicial opinions diverge. It has been thoroughly briefed and argued, and its resolution will relieve existing uncertainties and contribute to the efficient operation of our system of justice. We therefore consider it. *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 364-65; *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 622-23.

Civil commitments are governed by the Mental Health Code of 1967 (Ill. Rev. Stat. 1973, ch. 91½, pars. 1—1 through 20—1). Section 1—11 defines a "Person in Need of Mental Treatment" as "any person afflicted with a mental disorder, not including a person who is mentally retarded, as defined in this Act, if that person, as a result of such mental disorder, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs. This term does not include a person whose mental processes have merely been weakened or impaired by reason of advanced years." (Ill. Rev. Stat. 1973, ch. 91½, par. 1—11.) Other sections provide extensive safeguards clearly intended to minimize the possibility of confinement of persons for whose protection, or the protection of others, confinement is unnecessary. Among those are: sections 3—8 and 3—9 (Ill. Rev. Stat. 1973, ch. 91½, pars. 3—8, 3—9), requiring an explanation of the status and rights to be given every hospitalized patient in a language he understands within 12 hours of his admission; section 9—2 (Ill. Rev. Stat. 1973, ch. 91½, par. 9—2) providing for jury trials on the question of the need for mental treatment if such trial is requested by the patient, his spouse, relative, friend or an attorney for any of them; section 9—4 (Ill. Rev. Stat. 1973, ch.

91½, par. 9—4), providing for counsel and requiring the presence of the patient at any court hearing unless waived by counsel or the court finds such attendance would cause the patient serious risk of physical or emotional injury in which event the court or jury must personally observe and confer with the patient; sections 9—6 and 9—7 (Ill. Rev. Stat. 1973, ch. 91½, pars. 9—6, 9—7), limiting the authority of custodians; section 9—11 (Ill. Rev. Stat. 1973, ch. 91½, par. 9—11), providing that commitment as in need of mental treatment is not an adjudication of, and creates no presumption of, legal incompetency and does not deprive the patient of his civil rights (although the efficacy of the latter provision is questioned by defendant, who cites other statutory provisions authorizing revocations or suspensions of licenses, etc., following a finding that the holder is in need of mental treatment (*e.g.*, Ill. Rev. Stat. 1973, ch. 91, par. 55.13—6)); section 10—1 (Ill. Rev. Stat. 1973, ch. 91½, par. 10—1), permitting patients to file requests for discharge accompanied by a physician's certificate; and section 10—2 (Ill. Rev. Stat. 1973, ch. 91½, par. 10—2), providing:

"The superintendent of any hospital in which any patient is hospitalized as in need of mental treatment or as mentally ill under this Act or any prior Act shall, as frequently as practicable but not less than every 6 months, review the need for continued hospitalization of the patient, and make the results of such examination a part of the patient's record. At least once during the first year of a patient's hospitalization and once during each 2-year period thereafter, the superintendent shall file with the Department a written report, on a form which it prescribes, setting forth the reasons supporting the need for further hospitalization of the patient. At the same time this written report is filed, the superintendent shall give notice of such report to the patient, his attorney, his nearest relative, 2 other persons designated by the patient, and to the court which conducted the consultation or ordered the patient's hospitalization or continued hospi-

talization, whichever was later. Such notice must set forth the right which the patient or any person on his behalf shall have to secure a hearing on the need for continued hospitalization of the patient, by sending a request for hearing to the superintendent, the Department, or the court. Such request must be made to the court, Department, or hospital within 10 days, excluding Saturdays, Sundays and holidays, after the notice is received by the person who makes such request for hearing. If the request is made to the hospital or Department, such recipient shall notify the court of such request forthwith."

Section 10—3 (Ill. Rev. Stat. 1973, ch. 91½, par. 10—3) requires the court to appoint physicians to examine those patients who are indigent and file requests for discharge under section 10—1, and establishes the procedures for court hearings on such requests, including the appointment of counsel and jury trials for hearings under both sections 10—1 and 10—2. The continued use of writs of *habeas corpus* is expressly recognized by section 10—6. (Ill. Rev. Stat. 1973, ch. 91½, par. 10—6.) Section 10—8 (Ill. Rev. Stat. 1973, ch. 91½, par. 10—8) incorporates a 1969 amendment requiring review within 6 months by the superintendent of each hospital of all unrestored patients committed as mentally ill prior to January 1, 1964, for the purpose of determining their current competence and whether they might be adequately cared for outside the hospital; that amendment further required a petition and physician's certificate to be filed with the court in the cases of the pre-1964 committed patients and a determination by the court of the patients' competence, and, if still incompetent, appointment of conservators of the person and, if appropriate, of the estate. Sections 12—2 and 12—3 (Ill. Rev. Stat. 1973, ch. 91½, pars. 12—2, 12—3) contain specific provisions for the rights of patients to have visitors, telephonic communication and uncensored correspondence with attorneys and public officials, with any restriction upon visitation and telephonic communications

and the reasons therefor to be made a part of the patient's clinical record. Inspection of hospital records or divulging information regarding clinical or clerical data is severely limited. Section 10–4 (Ill. Rev. Stat. 1973, ch. 91½, par. 10–4) authorizes the hospital superintendents to grant patients absolute or conditional discharges or temporary releases.

These provisions of Illinois' comprehensive Mental Health Code are stated in some detail, not because we regard them as dispositive of the issue before us, but because we regard them as relevant in our consideration of the consequences attendant upon involuntary commitments. Those consequences are of primary concern in a determination of the required standard of proof.

Defendant contends that the reasonable doubt standard of proof is constitutionally required because the loss of individual liberty is at stake, and permanent and substantial stigmatization results from a civil commitment. Due process, however, is a flexible concept and depends, at least in part, on the circumstances of the particular matter in issue. *Morrissey v. Brewer* (1972), 408 U.S. 471, 481, 33 L. Ed. 2d 484, 494, 92 S. Ct. 2593, 2600.

Our society places an especially high but not completely unlimited value upon personal liberty and freedom, and, in criminal cases, the conviction of an innocent person is regarded as a greater encroachment upon those values than is the acquittal of one who is guilty. To minimize the possibility of the former, proof beyond a reasonable doubt is required to sustain a criminal conviction. (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073.) In contrast, the decision in the ordinary civil case only determines which party must bear an economic loss. Because there are no sound reasons for favoring one party over another, a preponderance of the evidence standard is used. (*In re Winship* (1970), 397 U.S. 358, 371, 25 L. Ed. 2d 368,

379, 90 S. Ct. 1068, 1076 (Harlan, J., concurring).) The case we deal with here, like many others, does not fit easily into either category. Thus, although commitments of the mentally ill are usually regarded as civil proceedings, analogies may be drawn to criminal proceedings. The most obvious, of course, is the potential loss of liberty which may well be of substantial duration. In our judgment, however, the application of labels or use of simplistic analogies is of little real assistance. More to the point, we believe, is an appraisal of the interests of the allegedly mentally ill individual and the society of which he is a part. Those interests are, in part, competing.

The fundamental liberty interest of the person facing commitment is self-evident. The Mental Health Code of 1967, as earlier noted, reflects a concern for that interest and, in its present form, represents a serious attempt to provide beneficial treatment and care for the mentally ill with the minimum ostracism and confinement consistent with protection of the public. Our free society's interest in prospectively protecting itself from dangerous or harmful conduct, standing alone, suffices to justify only minimal infringements upon an individual's personal liberty. A high value has also been placed, however, on our society's obligation to protect and care for those of its members unable to protect or care for themselves. It is important to a concerned and humane society that the margin of error be held to a minimum in denying such protection and care. Moreover, the individual involved, as well as society, has a strong interest in getting needed care or treatment which will enable him to function normally, and it seems to us that neither the interests of society nor the mentally ill are well served by a standard requiring proof so conclusive that many persons will be denied needed treatment, care and protection. Additionally, the release of an individual who is unable to control his conduct and likely to injure or endanger himself or others jeopardizes the interest of

society in the protection of its members. In contrast, of course, a standard of proof which tends to favor erroneous commitments infringes upon personal liberty, and this consideration persuades us, as it has the State, of the necessity for a standard more nearly conclusive than a mere preponderance of the evidence. But, in our judgment, the degree of infringement here is not so great as to require the proof beyond a reasonable doubt rule applicable in criminal cases. There are substantial differences. The line between guilt and innocence is, in an abstract sense, clear, *i.e.*, either defendant did or did not commit the offense, but the boundary between those persons who are dangerously mentally ill and those who are not is less well marked. It is a matter of the degree of disturbance, an appraisal of which is dependent upon subjective determinations and predictions. It is not unlikely that the mental health of a person erroneously committed will nevertheless be close to a point of serious illness, and that such persons might well benefit from the treatment accorded them while committed. In contrast, it is difficult to imagine any corresponding benefit accruing to an imprisoned innocent person. A further difference is to be found in that, even if the alternatives provided by section 9—6 are not utilized by the court and the individual is hospitalized, section 10—1 provides an opportunity for the speedy release of one no longer in need of mental treatment upon his own application; and the required periodic review and report by the superintendent of the hospital (section 10—2) is unparalleled in the laws controlling release of those serving criminal sentences.

On balance we believe that proof beyond a reasonable doubt is an inappropriate standard for use in involuntary civil commitment proceedings. Predictions of dangerousness can hardly be beyond a reasonable doubt in the undeveloped framework of the science of psychiatric diagnosis and prediction, for the subjective determinations

therein involved are incapable of meeting objective certainty. (*Tippett v. Maryland* (4th Cir. 1971), 436 F.2d 1153, 1165 (Sobeloff, J., concurring in part and dissenting in part), *cert. dismissed as improvidently granted sub nom. Murel v. Baltimore City Criminal Court* (1972), 407 U.S. 355, 32 L. Ed. 2d 791, 92 S. Ct. 2091; *Doremus v. Farrell* (D. Neb. 1975), 407 F. Supp. 509, 516-17; *Bartley v. Kremens* (E.D. Pa. 1975), 402 F. Supp. 1039, 1052, *prob. juris. noted* (1976), 424 U.S. 964, 47 L. Ed. 2d 731, 96 S. Ct. 1457; *Lynch v. Baxley* (M.D. Ala. 1974), 386 F. Supp. 378, 393; and *In re Valdez* (1975), 88 N.M. 338, 342-43, 540 P.2d 818, 822-23.) See also Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Calif. L. Rev. 693 (1974); Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U. Pa. L. Rev. 439 (1974); Rosenhan, *On Being Sane in Insane Places,* 179 Sci. 250 (1973); Scheff, Being Mentally Ill: A Sociological Theory 130-53 (1966).

Finally, we deem undesirable any additional steps which might erode the differences between mental health commitment proceedings and traditional criminal trials. (See *McKeiver v. Pennsylvania* (1971), 403 U.S. 528, 29 L. Ed. 2d 647, 91 S. Ct. 1976; *In re Winship* (1970), 397 U.S. 358, 375-76, 25 L. Ed. 2d 368, 90 S. Ct. 1068, 1079 (Burger, C.J., dissenting).) Mental illness is not a crime, and a person in need of mental treatment is not by reason thereof a criminal. But proof beyond a reasonable doubt is directly related to and associated with criminal trials and procedure, further exemplifying, in our opinion, its inappropriateness here.

As earlier intimated, we believe the appropriate standard of proof to be clear and convincing evidence. It is, in our opinion, compatible with the competing interests and consistent with due process. It requires a high level of certainty before finding an individual in need of mental treatment and curtailing his liberty, but does not place an

impossible burden on the State in proving its case.

The clear and convincing evidence rule applies in many areas of the law where a strict standard is desirable, and it is no stranger to Illinois. (*E.g., Galapeaux v. Orviller* (1954), 4 Ill. 2d 442, 446 (oral contract to devise); *Chicago Land Clearance Com. v. Yablong* (1960), 20 Ill. 2d 204, 207 (constructive trust); *Wright v. Wright* (1954), 2 Ill. 2d 246, 251 (resulting trust).) Due process requirements appear satisfied since this standard, or a lesser one, is frequently used in cases which are not purely civil or criminal but which have a substantial impact on fundamental rights and liberties. The Supreme Court has applied this standard in deportation proceedings (*Woodby v. Immigration & Naturalization Service* (1966), 385 U.S. 276, 286, 17 L. Ed. 2d 362, 87 S. Ct. 483, 488), in proceedings for the revocation of naturalization (*Chaunt v. United States* (1960), 364 U.S. 350, 5 L. Ed. 2d 120, 81 S. Ct. 147), and in expatriation proceedings (*Nishikawa v. Dulles* (1958), 356 U.S. 129, 2 L. Ed. 659, 78 S. Ct. 612). In this State, allegations of misconduct in attorney disciplinary proceedings must be proved by clear and convincing evidence. (*In re Bossov* (1975), 60 Ill. 2d 439, 441, *cert. denied* (1975), 423 U.S. 928, 46 L. Ed. 2d 256, 96 S. Ct. 275; *In re Simpson* (1971), 47 Ill. 2d 562, 566.) A similar standard of proof is applicable in conservatorship proceedings. (*Loss v. Loss* (1962), 25 Ill. 2d 515, 521.) Only "a clear preponderance of the evidence and not proof beyond a reasonable doubt" is required in a prosecution for a violation of a municipal ordinance. (*City of Chicago v. Mayer* (1974), 56 Ill. 2d 366, 371.) "[A] violation of the conditions of probation must be proved by a preponderance of the evidence." (*People v. Crowell* (1973), 53 Ill. 2d 447, 451; Ill. Rev. Stat. 1975, ch. 38, par. 1005–6–4(c).) This is so even though "the individual facing probation revocation may lose his liberty just as swiftly and surely as a defendant in a criminal case." (*People v. Grayson* (1974),

58 Ill. 2d 260, 265, *cert. denied* (1975), 421 U.S. 994, 44 L. Ed. 2d 484, 95 S. Ct. 2001.) The preponderance of the evidence standard also applies in paternity actions (*Mitchell v. Hindman* (1894), 150 Ill. 538, 540); and New York has upheld the compulsory commitment of narcotics addicts for treatment based on a preponderance of the evidence (*People v. Fuller* (1969), 24 N.Y.2d 292, 304, 248 N.E.2d 17, 22). We note, too, that while the principal issue in this case is one of first impression in this court, several of our appellate courts, beginning with *People v. Sansone* (1974), 18 Ill. App. 3d 315, 326, have uniformly held that clear and convincing evidence is the proper standard of proof. In addition, a slight majority of decisions from other jurisdictions where this issue has arisen or been discussed have used or upheld the clear and convincing evidence standard. (*French v. Blackburn* (M.D.N.C. 1977), 428 F. Supp. 1351, 1360); *Stamus v. Leonhardt* (S.D. Iowa 1976), 414 F. Supp. 439, 449; *Doremus v. Farrell* (D. Neb. 1975), 407 F. Supp. 509, 517; *Bartley v. Kremens* (E.D. Pa. 1975), 402 F. Supp. 1039, 1052, *vacated on other grounds* (1977), 431 U.S. 119, 52 L. Ed. 2d 184, 97 S. Ct. 1709; *Lynch v. Baxley* (M.D. Ala. 1974), 386 F. Supp. 378, 393; *In re Valdez* (1975), 88 N.M. 338, 343, 540 P.2d 818, 823; *Fhagen v. Miller* (Sup. Ct. N.Y. County 1970), 65 Misc. 2d 163, 317 N.Y.S.2d 128, 138, *modified* (1971), 36 App. Div. 2d 926, 321 N.Y.S.2d 61, *modified* (1972), 29 N.Y.2d 348, 328 N.Y.S.2d 393, *cert. denied* (1972), 409 U.S. 845, 34 L. Ed. 2d 85, 93 S. Ct. 47 (reasonable doubt standard rejected);*In re Salem* (1976), 31 N.C. App. 57, 228 S.E. 2d 649; *Powers v. State* (Tex. Civ. App. 1976), 543 S.W.2d 194, 196; *In re Levias* (1973), 83 Wash. 2d 253, 256, 517 P.2d 588, 590; and *State ex rel. Hawks v. Lazaro* (W. Va. 1973), 202 S.E.2d 109, 126. See also *Tippett v. Maryland* (4th Cir. 1971), 436 F.2d 1153, 1156, *cert. dismissed as improvidently granted sub. nom. Murel v. Baltimore City*

*Criminal Court* (1972), 407 U.S. 355, 32 L. Ed. 2d 791, 92 S. Ct. 2091 (preponderance of the evidence); and *Sabon v. People* (1960), 142 Colo. 323, 350 P.2d 576 (preponderance of the evidence). Contra *In re Ballay* (D.C. Cir. 1973), 482 F.2d 648; *Suzuki v. Quisenberry* (D. Hawaii 1976), 411 F. Supp. 1113, 1132; *Lessard v. Schmidt* (E.D. Wis. 1972), 349 F. Supp. 1078, 1095, *vacated on other grounds* (1974), 414 U.S. 473, 38 L. Ed. 2d 661, 94 S. Ct. 713; *In re Conservatorship of Roulet* (1976), 134 Cal. Rptr. 722, 725; *In re Pickles* (Fla. App. 1965), 170 So. 2d 603, 614; *Denton v. Commonwealth* (Ky. 1964), 383 S.W.2d 681, 683 (implied); *Lausche v. Commissioner of Public Welfare* (1974), 302 Minn. 65, 225 N.W.2d 366, 369, *cert. denied* (1975), 420 U.S. 993, 43 L. Ed. 2d 674, 95 S. Ct. 1430; *In re Perry* (1945), 137 N.J. Eq. 161, 164, 43 A.2d 885, 887; *Turner v. State* (Tex. Civ. App. 1976), 543 S.W.2d 453, 455.) Also, in *Lynch v. Overholser* (1962), 369 U.S. 705, 714, 8 L. Ed. 2d 211, 217, 82 S. Ct. 1063, 1069, the United States Supreme Court refers with apparent approval to the prohibition of pretrial mental commitment of a defendant "unless the Government is able to prove, by a preponderance of the evidence, that the accused is presently of unsound mind." Our review of these authorities fortifies our conclusion that a clear and convincing evidence standard passes constitutional muster.

We would add that, to the extent the adoption of a reasonable doubt standard is a protest against inadequate staff, facilities or treatment (see *In re Winship* (1970), 397 U.S. 358, 376, 25 L. Ed. 2d 368, 382, 90 S. Ct. 1068, 1079 (Burger, C.J., dissenting), and *In re Ballay* (D.C. Cir. 1973), 482 F.2d 648, 659-60), the result is inappropriate, for those problems should be presented and resolved in the legislative forum. Quite simply, the problem, if one exists, of inadequate treatment for the mentally ill is better resolved by improving the treatment provided than by

reducing the number to whom it can be given.

There is a third crucial distinction between this case and every case which adopts the reasonable doubt standard. Defendant's commitment in this case, unlike the commitments in all the other cases, was predicated upon evidence which, as hereinafter indicated, met the clear and convincing evidence standard. In essence, the holdings in those cases are rejections of the preponderance of the evidence standard, and, in that sense, are consistent with this opinion. Neither the parties nor we have found a single case holding a clear and convincing evidence standard unconstitutional. We perceive no good reason to do so in this case.

The defendant urges that *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068, requires use of the reasonable doubt standard. *Winship,* after comparing juvenile delinquency proceedings with criminal proceedings, held that proof beyond a reasonable doubt is necessary in both. In our judgment, however, the retributive and deterrent thrusts of incarceration for criminal conduct in criminal and juvenile proceedings are substantially dissimilar to the emphasis on medical treatment to be accorded the mentally ill through commitment proceedings. We are not prepared to say that a mental health hospital is merely a euphemism for prison. (See *Powell v. Texas* (1968), 392 U.S. 514, 529, 20 L. Ed. 2d 1254, 1265-66, 88 S. Ct. 2145, 2152; *In re Gault* (1967), 387 U.S. 1, 27, 18 L. Ed. 2d 527, 546, 87 S. Ct. 1428, 1443; *In re Urbasek* (1967), 38 Ill. 2d 535, 541.) *Winship, Gault* and *Urbasek* were all deeply concerned with the criminal aspect of juvenile proceedings—the child was in reality being convicted of a criminal offense and at times imprisoned therefor. Earlier in this opinion we emphasized the differences between mental health commitment proceedings and the criminal cases, and it is unnecessary to repeat them here. Finally, even if the analogies were

stronger, as in juvenile proceedings, due process would not require that all rights of a criminal defendant be accorded to the person whose commitment is sought. *Cf. McKeiver v. Pennsylvania* (1971), 403 U.S. 528, 29 L. Ed. 2d 647, 91 S. Ct. 1976.

A similar concern regarding what are, in substance, the equivalents of criminal convictions was manifested in *People v. Pembrock* (1976), 62 Ill. 2d 317, where this court held that proof beyond a reasonable doubt was required under the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1975, ch. 38, par. 105—1.01 *et seq.*). The defendant argues that this decision requires the application of the same standard of proof in this case. We do not find *Pembrock* controlling, however, for it was carefully noted that "[a] 'sexually dangerous person' creates different societal problems, and his past conduct is different in degree and kind from the conduct of persons in the larger, more inclusive class defined under the Mental Health Code" (62 Ill. 2d 317, 322). We continue to believe that the distinctions between criminal, juvenile and sexually dangerous person proceedings and involuntary civil commitments are sufficiently substantial to permit the use of different standards of proof.

The defendant urges that the evidence introduced at the commitment hearing did not meet the clear and convincing standard even if that is the correct standard. We do not agree. Two witnesses testified on behalf of the State. The substance of Willie Wilson's testimony was that defendant walked into a package liquor store where Wilson worked, said "This is it," shot the proprietor with a shotgun and then turned around and walked out. Dr. Robert DeVito, a board certified psychiatrist, testified he had examined defendant on February 11, had examined the records at the Illinois State Psychiatric Institute, and had talked to other doctors and staff personnel there regarding defendant's behavior and their observation of

him. Dr. DeVito related defendant's history, including an episode of mental illness resulting in his discharge from service when he was 20 years of age, separate episodes in 1972 and 1973 at the Cook County jail during which defendant was unable to sleep, paced around, experienced auditory hallucinations, thought "he was God or that he had some special gift that God had given him" and read biblical passages in the jail. The doctor concluded that defendant "was suffering schizophrenia paranoid type," and that, while "there was strong evidence [defendant] had improved considerable since being at the [Institute]," he was still suffering from a mental disorder and, in the doctor's opinion, "there is reasonable doubt as to whether he could control his actions in terms of being potentially dangerous to others or potentially dangerous to himself." Dr. DeVito also stated: "There is a chance he might be dangerous to others if returned to society at this time."

Dr. V. Siomopoulos, a staff psychiatrist at the Institute, was called by the defendant as an expert witness. Dr. Siomopoulos had observed defendant on several occasions during formal psychiatric interviews and informally on an almost daily basis for about four weeks. Defense counsel asked the following question: "Doctor, do you have an opinion based on a reasonable degree of psychiatric certainty and based upon your examination of Mr. Stephenson, whether Mr. Stephenson can reasonably be expected to intentionally or unintentionally injure himself now or within a reasonable time thereafter?" Dr. Siomopoulos replied: "Yes. I think there is a reasonable expectation that Mr. Stephenson would respond in a psychotic manner to the usual stresses of life if he is not hospitalized." He further stated that "there is a good possibility that if he became psychotic that he may become dangerous to himself or to others." After the court sustained an objection to a question preliminary to showing a prior inconsistent statement by the doctor, an

offer of proof was made by defense counsel and not ruled on by the court. In the course of that testimony the doctor explained that he had just become aware of the "subtleties" of section 1—11 of the Mental Health Code of 1967 (Ill. Rev. Stat. 1973, ch. 91½, par. 1—11), which was why he had changed his former opinion that the defendant was not in need of mental treatment as defined in the Mental Health Code of 1967. The doctor conceded that the chance of Stephenson becoming psychotic was not beyond a reasonable doubt, but stated he thought "there is a good—reasonable expectation that within a reasonable time from this hearing he would become psychotic" and that "if exposed to life's stresses, common life stresses, he may respond in a psychotic manner and perhaps in homicide." The doctor also stated he could not recall personally observing any violent behavior by defendant nor noting any in the nurses' reports. Contrary to defendant's assertion, we find in the record no indications of inaccuracy or unreliability in the psychiatric testimony nor that future treatment of defendant will be inadequate. We agree with the appellate court that this evidence clearly and convincingly establishes defendant as a person in need of mental treatment and hospitalization.

The defendant lastly argues that Wilson's testimony concerning the murder was irrelevant and severely prejudicial since, he urges, conduct occurring 15 months earlier can have no bearing on his need for mental treatment at the time of the hearing. While there may well be a point where the lapse of time has been so great that the probative value of prior conduct has diminished to irrelevancy, Stephenson's shooting of the liquor store proprietor does not fall in that category and is not so disassociated with the hearing as to be irrelevant. Quite the contrary is true: the petition to commit the defendant was presented as a direct result of that conduct, and this evidence is highly relevant to the issue of the reasonable

expectation of the defendant's dangerousness. Defendant argues that the failure of the expert witnesses to consider this conduct in drawing their conclusions demonstrates its irrelevance. But that argument overlooks the fact that it is the trier of fact who is to consider all the evidence and make the final decision (see *Humphrey v. Cady* (1972), 405 U.S. 504, 509, 31 L. Ed. 2d 394, 402-03, 92 S. Ct. 1048, 1052; *People v. Ford* (1968), 39 Ill. 2d 318, 320; *In re Graham* (1976), 40 Ill. App. 3d 452, 454), not the psychiatrists. It is clearly proper for the court to consider and base its decision on evidence in addition to the expert testimony.

The judgment of the appellate court is accordingly affirmed.

*Judgment affirmed.*