THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK NAYDER, Defendant-Appellant.

First District (4th Division)    No. 80-2611

Opinion filed May 13, 1982.

James J. Doherty, Public Defender, of Chicago (Michael Woloshin and Judith A. Stewart, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Thomas Wood Flynn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

On August 7, 1980, a representative of the Department of Mental Health filed a petition in the circuit court of Cook County requesting the involuntary hospitalization of respondent, Frank Nayder. The petition alleged that respondent was a person who was mentally ill and who, because of his illness, was reasonably expected, in the near future, to harm himself or another; further, respondent was unable to provide for his basic physical needs so as to protect himself from serious harm. (Ill. Rev. Stat. 1979, ch. 91½, par. 1—119.) That same day a certificate was filed by Dr. Carlos Segovia, a qualified psychiatrist who is a member of the staff of Madden Mental Health Center where respondent was hospitalized, stating that in his opinion respondent was mentally ill and unable to care for himself. Shortly thereafter, a second certificate stating the same opinion was filed by Dr. Gilbert Parent, another psychiatrist on the staff of Madden Mental Health Center. The second certificate additionally stated that respondent was a danger to others.

Following a hearing on September 3, 1980, at the Illinois State Psychiatric Institute, the trial court found respondent to be a person subject to involuntary admission and ordered that he "be hospitalized in the Department of Mental Health and Developmental Disabilities."

Respondent appeals the order, claiming that it was error for the trial court to permit the State to call him to testify as an adverse party pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60) because he was thereby deprived of the effective assistance of counsel. Respondent argues that he was denied counsel's advice in determining whether to testify and, if he did so, what the timing and content of his

testimony should be. He also claims that he was deprived of the right to effective assistance of counsel under the provisions of the Mental Health Code (Ill. Rev. Stat. 1979, ch. 91½, par. 6—100). He further argues that calling him to testify under section 60 deprived him of due process of the law because of the imbalance in the proceedings resulting from the unavailability of section 60 to him as respondent. Respondent additionally claims that his "threats" against a police commander were protected speech under the first amendment because they did not amount to "fighting words" and therefore were improperly used as a basis for finding him to be subject to involuntary commitment. Finally, respondent asserts that the State failed to prove, by clear and convincing evidence, that he was unable to care for himself.

We disagree with respondent and affirm the trial court's judgment that respondent is in need of continuing mental treatment and should remain hospitalized.

BACKGROUND

Respondent had been committed by the circuit court of Cook County to hospitalization in the Madden Mental Health Center, and had been at Madden continuously from May 28, 1980, until the September 3, 1980, hearing appealed from here. The September 3 hearing resulted from the decision of Madden staff psychiatrists that at the time the original commitment period was over, respondent was not yet ready to be discharged as able to care for himself.

At his hearing, respondent's counsel moved to withdraw because respondent claimed counsel was not representing him adequately. The trial court asked respondent whether he in fact did not want attorney Joslyn or the public defender's office to represent him. Respondent answered that he had tried to talk to Ms. Joslyn, his counsel of record, about a "weighty thing" which involved considering Doctors Segovia and Parent (Madden staff psychiatrists) to be "malpractitioners" and drug addicts who were "running a concentration camp." Respondent, who has a Ph.D. degree in biochemistry, further stated that he had written a "drug paper" and sent copies to Jimmy Carter, Tip O'Neill, Kurt Waldheim, the Pope, and others, that "[t]hey have railroaded me into Madden," and that his counsel was also "on drugs." The trial court denied counsel's petition to withdraw.

The State then called respondent as a witness under section 60. Respondent's counsel objected that this procedure would frustrate respondent's right to counsel because respondent's counsel "should be the one to choose what evidence to put on, and not the State." Counsel also argued that forcing respondent to testify would conflict with his "right to

refuse to talk to somebody [and] * * * various other constitutional-type rights * * *." Acknowledging the validity of counsel's argument "in that it is a civil proceeding, and yet it is coupled with deep consideration for the civil liberties of the person asserted to be mentally ill," the trial court ruled that section 60 nevertheless should apply because the proceedings were civil in nature, and counsel would have to work within the framework of the laws applicable to such proceedings.

Respondent was then called as a witness under section 60. He testified that he lived in a house owned by himself and six others and that there had been 400 violations to his property, including illegal entry, vandalism, theft, and sabotage, about which he had called the police 90 times with no response. He went to the State's Attorney's office and complained, naming as drug users certain neighbors who he said had threatened him with castration and murder. Respondent testified that he went to see the youth officer five or 10 times, and was insulted and "strong armed" out of the station by police officers. He stated that the police have "the character of lice."

Respondent testified that he had tried to talk to police commander Mildice, who was never available. The State asked respondent whether he had threatened to harm Mr. Mildice. Respondent's counsel's objection to the question was sustained and she advised him not to answer, but he went on to describe the alleged vandalism of his property and his calls to the police. Finally respondent said of Commander Mildice, "You ought to be lynched or something. Someone is going to blow your brains out if you can't do a commander's job and you let every window of the stores be robbed."

The State next called Dr. Carlos Segovia, a psychiatrist at Madden Mental Health Center. Dr. Segovia testified that respondent is basically alert, oriented, coherent, and relevant, but that he has problems with loose associations, tangential thoughts and flight of ideas, and is delusional. One of respondent's false beliefs is that almost everyone is against him—a delusion of persecution. Dr. Segovia further testified that respondent could follow a conversation and was interested in literature and music, but when discussing his hospitalization or his life and the length of his illness he became loud, abusive, threatening, and used foul language. Respondent has a good sense of humor, but cannot recognize that he has a mental problem and is not functioning as he should.

Dr. Segovia also testified that respondent told him he had established a "Foundation" and was doing research on the use of feces to make food, that he collected stools and had not used the toilet for several years. Respondent was not violent, but refused to take his prescribed tranquilizing medications, even though they helped him function better. Respond-

ent claimed the medications were causing him to develop diverticulitis of the bowel and to become Mongoloid—his eyes were slanting and he was becoming "Chinese-like."

Dr. Segovia then testified about the condition of respondent's home based on a visit made 1½ months earlier by Dr. Gilbert Parent. Dr. Parent indicated that the house was a "near shambles" and in a very unhygienic condition, with garbage and newspapers accumulated everywhere and rabbit droppings on the floor. Respondent also told Dr. Segovia he had not taken a bath for a year before going to Madden, and slept "dressed up" in a sleeping bag.

Dr. Segovia's opinion was that respondent was suffering from a paranoid illness of major psychotic proportions. Further, respondent would be unable to care for himself if he were released from the hospital. While he did not believe respondent was homicidal or suicidal, he did believe respondent's condition would deteriorate if his needs went unattended, and "he might indeed, in desperation, injure himself or others" in the near future.

On cross-examination by respondent's counsel, Dr. Segovia stated that respondent had not been dangerous or violent in the hospital, and that he bathed and ate. Dr. Segovia's opinion was that respondent's paranoia is a permanent condition, although it might be minimized with medication.

After hearing and considering the evidence, the trial court found respondent to be subject to involuntary hospitalization because he is mentally ill and, because of his illness, could reasonably be expected to harm himself. Further, respondent would be unable to provide for his basic physical needs or guard himself against harm. Respondent appeals.

OPINION

I

Respondent Nayder's first argument on appeal is that the State's calling him to testify as an adverse party under section 60 denied him his constituional right to effective assistance of counsel in that it interfered with counsel's judgment regarding whether he should testify and, if so, what the timing and content of his testimony should be. Respondent also claims that his compelled testimony under section 60 was a violation of the Mental Health Code (Ill. Rev. Stat. 1979, ch. 91½, par. 6—100), which provides for effective assistance of counsel, as well as a violation of due process of the law because section 60 could not be used by him as it was by the State. He argues that "[a] mental health respondent * * * in civil commitment proceedings where his fundamental right to liberty is in issue, no less than the criminal defendant, requires the effective assistance

of counsel in the proceedings against him." We agree that respondent is entitled to effective assistance of counsel, but disagree with his claim that he failed to receive it at the hearing appealed from.

Respondent's arguments regarding his constitutional rights to effective assistance of counsel and due process (U.S. Const., amends. VI and XIV; Ill. Const. 1970, art. I, secs. 2 and 8) are predicated on the deprivation of liberty that results from an involuntary commitment. On this basis respondent attempts to equate a commitment proceeding to a criminal trial, citing *In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273. The Illinois Supreme Court in *Stephenson* did indeed observe that certain analogies may be drawn between civil commitment proceedings and criminal prosecutions; however, it concluded, "the application of labels or use of simplistic analogies is of little real assistance. More to the point * * * is an appraisal of the interests of the allegedly mentally ill individual and the society of which he is a part. Those interests are, in part, competing." 67 Ill. 2d 544, 554, 367 N.E.2d 1273, 1276.

The issue in *Stephenson* was what standard of proof should be required in a civil involuntary commitment case. The supreme court rejected the argument that proof beyond a reasonable doubt was required, and held that the proper standard of proof was clear and convincing evidence. In reaching its conclusion, the court examined the question whether the confinement that results from a civil commitment renders the proceeding sufficiently similar to a criminal trial to require all the protections afforded a criminal defendant—protections which respondent attempts to invoke here. The court found that the interests of our free society in protecting itself from harmful conduct and in protecting those of its members who are unable to care for themselves must be balanced against the liberty interest of the person facing commitment. The attempt to equate the two types of proceedings was thus rejected by the *Stephenson* court, which clearly stated that "we deem undesirable any additional steps which might erode the differences between mental health commitment proceedings and traditional criminal trials." 67 Ill. 2d 544, 556, 367 N.E.2d 1273, 1277.

■■ Furthermore, we note that civil commitment differs fundamentally from criminal imprisonment in that its purpose is to protect and cure, not to punish. A civil commitment is not punitive, and therefore "can in no sense be equated to a criminal prosecution." (*Addington v. Texas* (1979), 441 U.S. 418, 428, 60 L. Ed. 2d 323, 332, 99 S. Ct. 1804, 1810.) Finally, this court has held that the State's calling a respondent as a witness under section 60 violates neither his constitutional rights nor the Mental Health Code. (*In re Powell* (1980), 85 Ill. App. 3d 877, 407 N.E.2d 658; *In re Nolan* (1978), 66 Ill. App. 3d 744, 384 N.E.2d 134.) Accordingly, we find that respondent's constitutional rights were adequately protected at his

hearing, which was conducted in conformity with the standards appropriate to a civil commitment proceeding.

## II

■■ Respondent also argues that his "threats" against police commander Mildice were protected speech under the first amendment and therefore should not have been admitted as evidence that he was in need of involuntary commitment "on the grounds of dangerousness to himself." We find this argument to be lacking in merit for two reasons. First, respondent's right to freedom of speech has in no way been abridged. A civil commitment is not punitive in nature. (*Addington v. Texas* (1979), 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804.) Respondent himself chose to repeat at his hearing the "threats" he had made, thereby putting the statement into evidence on the issue of his need for mental treatment. And second, even assuming *arguendo* that the statement was not probative on the issue of respondent's dangerousness to himself, we note that respondent was also asserted to be potentially dangerous to others and unable to care for himself. We find no error in considering the statement as evidence on these latter two issues.

## III

Respondent's final claim is that the State failed to prove, by clear and convincing evidence, that he was unable to care for himself. We disagree. To subject a person to involuntary commitment for mental treatment the State must show by clear and convincing evidence (Ill. Rev. Stat. 1979, ch. 91½, par. 3—808; *In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273) that because of the illness the person "is reasonably expected to inflict serious physical harm upon himself or another in the near future; or * * * is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1979, ch. 91½, par. 1—119.) In applying these principles, Illinois courts have recognized that the science of predicting future dangerous conduct is inexact, and have upheld commitments based on the opinion of a qualified psychiatrist that the respondent was reasonably expected to engage in dangerous conduct. (*In re Powell* (1980), 85 Ill. App. 3d 877, 407 N.E.2d 658; *People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733.) Involuntary commitment need not be delayed until someone is harmed. *In re Powell*; *In re Graham* (1976), 40 Ill. App. 3d 452, 352 N.E.2d 287.

■■ The facts adduced at trial regarding respondent's mental state have been outlined above. Respondent and Dr. Segovia both testified about respondent's bizarre beliefs and actions. Dr. Segovia's opinion was that respondent suffers from a paranoid illness of major psychotic proportions, that he would be unable to care for himself outside the hospital, and

that he might well injure himself or another in the near future. The trial court found the evidence of respondent's need for continued hospitalization to be clear and convincing, and after reviewing the record, we agree. The judgment of the circuit court is accordingly affirmed.

Affirmed.

JOHNSON, P. J., and JIGANTI, J., concur.