In re TYRONE S., Alleged to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Tyrone S., Respondent-Appellant).

First District (1st Division)    No. 1—01—3968

Opinion filed May 27, 2003.

---

496

Kimberly A. Duda, of Law Office of Kimberly A. Duda, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Heather Weiss, and Thomas Loftus, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

This case involves a petition that alleges respondent, Tyrone S., to be a person subject to involuntary admission for mental health treatment. Under the Mental Health and Developmental Disabilities Code

(Code), a person is subject to involuntary admission if he or she has a mental illness and because of that illness is either "reasonably expected to inflict serious physical harm on himself or herself or another in the near future" or is "unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm." 405 ILCS 5/1—119(1), (2) (West 2000).

Respondent appeals from the circuit court's order finding that he is a person subject to involuntary admission and ordering that he be hospitalized in the Department of Human Services. Respondent contends that the circuit court erred in committing him because the State did not prove by clear and convincing evidence that he reasonably could be expected to inflict serious harm upon himself or another in the near future.

## BACKGROUND

On August 8, 2001, respondent was admitted to the Tinley Park Mental Health Center (TPMHC) following his release from the county jail. Respondent had been incarcerated pursuant to a guilty plea to a charge of public indecency. Soon after he arrived at the facility, respondent signed a voluntary admission form. He submitted notice of his desire to be discharged on September 12, 2001. In response, the State filed a petition for involuntary admission, alleging that respondent was a person who was mentally ill and because of his illness was reasonably expected to inflict serious physical harm on himself or another and that he was unable to provide for his physical needs. The State later withdrew the physical needs portion of its petition and proceeded to hearing alleging that respondent was reasonably expected to inflict serious harm on himself or another due to his mental illness.

A hearing was held on the State's petition on October 16, 2001. The State called two witnesses on direct examination, mental health technician Maurice Stegall and psychiatrist Dr. Phyu-Mar Hla, both of whom were assigned to TPMHC at the time of respondent's stay.

Stegall testified that on September 4, 2001, he observed respondent openly masturbating while situated in the doorway of another patient's bedroom. Stegall conveyed to respondent that such behavior was inappropriate and then sought to consult the nurse on duty as to what was to be done in response to respondent's actions. The nurse, Terry Thompson, directed that respondent be given an injection in order to quell his actions. Stegall and two other technicians approached respondent to assist Thompson in administering the injection, at which point respondent began cursing loudly, refusing to take the shot, and striking out at Stegall and the other technicians. Stegall and the other

staff members had to wrestle respondent to the floor, where respondent attempted to kick and scratch those restraining him. Stegall stated that four or five other staff members were summoned to assist and ultimately placed respondent in full leather restraints.

On cross-examination, Stegall testified that at least two other staff members, including Dr. Hla, observed respondent masturbating in the doorway of the other patient's room. He also stated that respondent ceased this behavior when Stegall admonished him to stop, and that, to his knowledge, respondent had not attempted to strike anyone other than on that date.

On redirect examination and in response to questions posed directly by the court, Stegall testified that on September 4, he only consulted the nurses' station to report respondent's behavior and that the decision to administer an injection was made by the nurse on duty, not by Stegall.

The State then called Dr. Hla. Respondent stipulated that Dr. Hla was an expert qualified to render an opinion in psychiatry and mental illness. Dr. Hla testified that, as the psychiatrist in charge of respondent's care, she had multiple opportunities to observe and evaluate respondent. She had diagnosed respondent as having a delusional disorder, manifested by respondent's belief that all women (fellow patients, staff, and Dr. Hla herself) desired him sexually. Respondent would act out on this belief by talking about it aloud with other patients, openly masturbating, exposing himself, and writing letters to staff members alleging their desire for him. Respondent often reacted in a hostile manner when given verbal redirection and would not participate in meetings regarding his prescribed behavioral plan.

Dr. Hla related that respondent had been admitted to TPMHC and other mental health facilities on prior occasions and had been ruled unfit to stand trial for the crime of stalking. She had consulted with other professionals and staff involved in respondent's care and examined his medical records in formulating her diagnosis of respondent's mental illness as a delusional disorder exhibited by his constant preoccupation with sex. She stated that respondent's condition impaired his judgment and substantially affected his ability to cope with the ordinary demands of life in that he would often become verbally abusive and combative when his delusions were challenged.

Dr. Hla's opinion was that respondent, because of his mental illness and the agitation resulting from his inability to deal with his delusions in a rational manner, was reasonably expected to inflict harm on himself or others in the near future. In support of this opinion, Dr. Hla cited the incident of September 4, related by Stegall. Another incident took place in the early morning of August 26, 2001,

when respondent consistently followed one of the female nurses and repeatedly told her she was beautiful. Another time, respondent, naked at the time, wheeled himself into the day area and began openly masturbating. On both occasions, respondent refused verbal redirection and ultimately had to be medicated and restrained. Finally, on September 23, 2001, respondent became loud and combative in the TPMHC dining room, again refused verbal redirection, and threatened to "get" the nurse who ultimately injected him and had him restrained.

Dr. Hla testified that it was her opinion that hospitalization was the least restrictive treatment option available to respondent at the time of the hearing. She and her staff had explored other options for respondent, such as nursing homes and community placements, but none of the facilities contacted would accept respondent because of the behavior he had exhibited and because none of them had the capability to monitor respondent adequately. Respondent had a history of exposing himself in public before entering TPMHC and had been found in the bed of a quite debilitated female patient during his stay at a nursing home. Dr. Hla recommended that respondent receive psychiatric treatment, preferably medication, before he could be moved to a less restrictive setting.

On cross-examination, Dr. Hla stated that respondent had never actually attempted to harm anyone physically at the times he had been forcibly medicated and restrained. She also testified that several female patients and staff complained daily about respondent's inappropriate behavior toward each of them. Dr. Hla related an incident in which respondent had followed a female patient into the women's bathroom and asked her for a sexual favor, and the patient became frightened and ran out of the room as a result. Dr. Hla stated that, because of his delusions, respondent was likely to harm another person physically were he discharged from TPMHC. This was her opinion despite the fact that respondent is wheelchair-bound.

Respondent then testified on his own behalf, stating that he was originally admitted to TPMHC involuntarily, but signed in as voluntary admittee, and that Dr. Hla and other staff had told him he did not qualify for hospitalization and was eligible for discharge. Respondent stated that he had been accepted to stay at All American Nursing Home, but that Dr. Hla wanted to go court to contest his discharge.

As to the scuffle with male staff members on September 4, 2001, respondent stated that the staff were watching him as he went to bed that night, that he told them he knew they were looking at him, and that the staff then "got smart" and told him, "[Y]ou can get a shot."

Respondent alleged that he had gone into room 215 that night to look for something, that Stegall told him he had to leave the room, and that soon afterward Thompson told him he had to receive an injection. When respondent refused the shot, Stegall grabbed and choked him, the other staff members flipped his wheelchair, and he resisted in order to keep from being choked. Respondent stated that he never tried to kick anybody and that he can only move his legs a little and cannot move his left foot at all.

When asked about the incident involving the female patient in the washroom, respondent testified that she had consented to enter the bathroom with him and that, once inside, they only talked. He stated that he never physically assaulted, lunged at, or grabbed anyone during his time at TPMHC. When asked if he was currently on any medication, respondent launched into a long, tangential narrative about how he had come to be in jail, other mental health facilities, and eventually TPMHC, before answering in the negative.

On cross-examination, respondent testified that all of the women at TPMHC, both staff and patients, gave him a "hard time" when he would make requests and that they would "stick together" in that endeavor. He stated that he had reported their behavior to Brenda Hampton, whose professional capacity he did not make clear in his testimony. When questioned about the September 4 incident and his prescribed behavior plan, respondent gave another lengthy and winding narrative about how well he got along with the female patients in TPMHC and stated that the behavior plan authored by Dr. Hla was a fabrication, and he was not a threat to female patients and staff. He stated that he had never bothered any women while he had been living on the street and that the times he had been restrained were orchestrated by TPMHC staff in response to his reporting them to Brenda Hampton, not because he had exposed himself or otherwise behaved inappropriately.

The circuit court found that: (1) respondent suffered from mental illness in the form of a delusional disorder; (2) respondent was symptomatic of such a disorder; (3) respondent presented a danger to himself or others as shown by the behavior and aggression displayed during his most recent stay at TPMHC; (4) respondent exhibited the behavior characteristics of his mental illness, especially through his random and wandering testimony; (5) the State had explored alternatives to hospitalization and any other treatment setting would not be appropriate; and (6) the evidence presented was not merely clear and convincing, but proved beyond a reasonable doubt that respondent should remain hospitalized.

On appeal, respondent contends that the circuit court erred in

committing respondent because the State did not prove by clear and convincing evidence that respondent could reasonably be expected to inflict harm upon himself or another in the near future. More specifically, respondent alleges that the State presented no explicit medical testimony to that effect and that there is no factual basis for the opinion that respondent is dangerous. Respondent argues that Dr. Hla never explicitly testified that it was her opinion that respondent was a danger to himself or others, and that she only stated that she had an opinion and described what it was. Respondent also argues that even if Dr. Hla had such an opinion, there was no factual basis for it, since his behavior (which at times may have been loud, combative, or offensive to others) never posed a danger to himself or others until he realized he was about to be given a shot. He characterizes such testimony about any dangerous conduct on his part as vague and conclusory.

## ANALYSIS

■ Under the Mental Health and Developmental Disabilities Code, a person is subject to involuntary admission if he or she has a mental illness and because of that illness is either "reasonably expected to inflict serious physical harm on himself or herself or another in the near future" or is "unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm." 405 ILCS 5/1—119(1), (2) (West 2000). Involuntary admission implicates substantial liberty interests of a person, and these interests must be balanced against the need to provide care for those unable to care for themselves and the need to protect society from the dangerously mentally ill. *In re Robinson*, 151 Ill. 2d 126, 130-31 (1992). A person may not be confined against his or her will merely because he or she is mentally ill and is dangerous to no one and can live safely in freedom. *In re Winters*, 255 Ill. App. 3d 605, 609 (1994).

■ In order to prove that a person is reasonably expected to inflict harm on himself or another, the State must present clear and convincing evidence in the form of explicit medical testimony given by a psychiatrist, clinical social worker, or clinical psychologist who examined the person. 405 ILCS 5/3—807, 3—808 (West 2000). Such testimony is considered clear and convincing if the medical expert bases his or her diagnosis on direct observation of the patient. *In re Tuman*, 268 Ill. App. 3d 106, 111 (1994). A circuit court does not require proof of actual harm inflicted by a patient before finding him or her to be mentally ill and reasonably expected to inflict harm on another and ordering hospitalization. *In re Knapp*, 231 Ill. App. 3d 917, 920 (1992).

■ A circuit court's finding that a person is subject to involuntary admission will not be reversed unless it is against the manifest weight of the evidence. *In re Bert W.*, 313 Ill. App. 3d 788, 794. Such a finding is given great deference and will not be set aside even if the reviewing court, after applying the clear and convincing standard, would have ruled differently. *In re Friberg*, 249 Ill. App. 3d 86, 94 (1993). The trial court is in the best position to determine the credibility of testifying witnesses and weigh the evidence, and its determination should not be reversed unless it is manifestly erroneous. *In re Cutsinger*, 186 Ill. App. 3d 219, 223 (1989).

Illinois courts have recognized that the science of predicting future dangerous conduct is inexact and have upheld commitments based on the opinion of a qualified psychiatrist that the respondent was reasonably expected to engage in dangerous conduct. *People v. Nayder*, 106 Ill. App. 3d 489, 495 (1982). Courts need not delay involuntary commitment until someone is harmed. *In re Graham*, 40 Ill. App. 3d 452 (1976).

On appeal, respondent does not contest the court's finding that he is mentally ill, but he does contend that Dr. Hla never expressed an explicit opinion that he would be reasonably expected to inflict physical harm on himself or another as a result of his mental illness and that there was no factual basis for this opinion. We find it curious that, if indeed Dr. Hla never gave an opinion as to whether respondent is dangerous, respondent contests the factual basis for an opinion that was never given.

In this case, Dr. Hla was qualified as a medical expert witness and had on numerous occasions observed respondent's behavior directly. She testified that, based on her observations, she had diagnosed respondent as having a delusional disorder marked by a constant preoccupation with sex, which respondent exhibited with several instances of lewd behavior. On direct examination, the State asked Dr. Hla "Do you have an opinion *** [as to] whether because of that mental illness the respondent in the future is reasonably expected to inflict harm on himself or others?" Dr. Hla responded, "Yes," and went on to state that respondent's mental illness prevents him from responding positively to behavioral redirections, causing him to become agitated and combative and to act out on staff members seeking to correct his behavior.

Dr. Hla testified that there were multiple occasions when she had seen respondent engage in this type of behavior and then become loud, agitated, and combative when confronted with verbal redirections concerning his inappropriate behavior. Furthermore, when respondent failed to respond to verbal redirection, Dr. Hla stated that

she had seen respondent lash out physically at those attempting to redirect his behavior.

Moreover, on cross-examination, respondent's counsel asked Dr. Hla "So it's your opinion *** that [respondent] poses a danger once he's discharged, even though he's in a wheelchair?" Dr. Hla responded in the affirmative, noting that respondent had attempted to strike staff members and that it had taken several male staff members to restrain him on at least one occasion.

Maurice Stegall corroborated Dr. Hla's assertions through his own testimony that respondent had attempted to strike, scratch, and kick Stegall and other TPMHC staff members when they attempted to correct respondent's inappropriate behavior. It is abundantly clear from the record that Dr. Hla gave an explicit opinion as to the danger respondent is likely to pose to others and that she had a more than adequate factual basis for this opinion.

■ In this case, it is clear that respondent is mentally ill, as established by Dr. Hla's diagnosis. While this alone cannot serve as a basis for his involuntary admission, his behavior while residing at TPMHC and on prior occasions leads us to believe that he is reasonably expected to inflict harm on another were he to be placed in a less restrictive setting.

Given respondent's hostile reactions when confronted by TPMHC staff, it is reasonable to conclude that harm is likely to occur if and when someone, either a non-mental-health professional or possibly a police officer, confronts respondent's similar behavior in a less restrictive setting. Considering the incident Stegall described and similar incidents, Dr. Hla's statement that respondent had been found in the bed of another patient during his stay at a nursing home, respondent's arrest record, and respondent's own disjointed and often incoherent testimony, we find that the circuit court's ruling was not manifestly erroneous.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

McNULTY and SMITH, JJ., concur.